1
 2025 CO 42 The People of the State of Colorado, Plaintiff-Appellee v. Robert Keith Ray. Defendant-Appellant No. 10SA157
Supreme Court of Colorado, En Banc
June 23, 2025
 
          ADVANCE
 SHEET HEADNOTE
 
 
          In this
 direct appeal, the defendant asserts that the district court
 erred by admitting uncharged misconduct evidence as res
 gestae, witness- and victim-fear evidence, victim-impact
 evidence during the guilt phase of trial, and positive
 evidence of the homicide victims' characters. He also
 asserts that the prosecution engaged in numerous instances of
 misconduct, which violated his right to a fair trial. He
 further contends the district court erred by denying his
 request to subpoena jurors to investigate allegations of
 juror misconduct during deliberations. And finally, the
 defendant challenges his sentence -a term of life
 
 2
 
 without the possibility of parole, which was imposed after
 the Governor commuted his originally imposed death
 sentence-as unconstitutional under the Eighth Amendment.
 
 
          The
 supreme court concludes that although the district court
 erred in some ways, none of those errors, individually or
 cumulatively, warrant reversal. Similarly, although some of
 the prosecution's comments were improper, none of them
 constitutes reversible misconduct. The supreme court further
 concludes that the district court properly denied inquiry
 into alleged juror misconduct under CRE 606(b). And lastly,
 the court holds that the defendant's sentence is
 constitutional.
 
 
          The
 supreme court therefore affirms the judgment of conviction
 and commuted sentence.
 
 
           Appeal
 from the District Court Arapahoe County District Court Case
 No. 06CR697 Honorable Gerald J. Rafferty, Judge
 
 
          
 Attorneys for Plaintiff-Appellee: Philip J. Weiser, Attorney
 General Katharine Gillespie, Senior Assistant Attorney
 General Carmen Moraleda, Senior Assistant Attorney General
 Denver, Colorado
 
 
          
 Attorneys for Defendant-Appellant: Elisabeth Hunt White
 Boulder, Colorado
 
 
          
 Johnson &Klein, PLLC Gail K. Johnson Eric K. Klein
 Boulder, Colorado
 
 3
 
           CHIEF
 JUSTICE MÁRQUEZ, JUSTICE BOATRIGHT, JUSTICE GABRIEL,
 JUSTICE HART, and JUSTICE BERKENKOTTER joined.
 
 
          
 JUSTICE SAMOUR did not participate.
 
 4
 
          
 OPINION
 
 
           HOOD,
 JUSTICE
 
 5
 
          ¶1
 Javad Marshall-Fields and his fiancee, Vivian Wolfe, were
 killed in a drive-by shooting ("the Dayton Street
 shooting"), just eight days before Marshall-Fields was
 expected to testify against Robert Keith Ray. Marshall-Fields
 had identified Ray as one of two gunmen in another shooting
 at Lowry Park the year before ("the Lowry Park
 shooting").
 
 
          ¶2
 Ray was eventually charged with numerous offenses related to
 the Dayton Street shooting, and a jury found him guilty of
 nearly all of them. The district court entered the judgment
 of conviction, and following a separate sentencing trial,
 sentenced Ray to death. Pursuant to the unitary review
 process then in effect, Ray appealed his convictions and
 sentences related to the Dayton Street shooting directly to
 this court. See §§ 16-12-201 to -210,
 C.R.S. (2024); Crim. P. 32.2. This opinion addresses that
 appeal.
 
 
          ¶3
 The Colorado General Assembly subsequently abolished the
 death penalty, and in March 2020, Governor Jared Polis
 commuted Ray's capital sentence to a sentence of life
 without the possibility of parole ("LWOP").
 Although we determined that the unitary review process no
 longer applied in this case, we chose to retain jurisdiction
 over the appeal. And, having reviewed Ray's challenges to
 his convictions and LWOP sentence, we now affirm.
 
 6
 
          I.
 Facts and Procedural History
 
 
          ¶4
 Ray was charged with twenty-one counts related to the Dayton
 Street shooting, which included two counts of first degree
 murder for the deliberate killing of Marshall-Fields and
 Wolfe.[1] The prosecution's theory of the case
 was that Ray had conspired with others to prevent witnesses
 of the Lowry Park shooting from testifying in that trial, and
 that conspiracy culminated in the murders of Marshall-Fields
 and Wolfe. To understand the full context of Ray's trial
 for the Dayton Street shooting, we must therefore begin with
 the Lowry Park shooting.
 
 
          A.
 The Lowry Park Shooting
 
 
          ¶5
 On July 4, 2004, Marshall-Fields and Gregory Vann hosted a
 barbecue and rap battle at Lowry Park. The event was well
 attended, and a large crowd gathered at the park throughout
 the afternoon and evening. As the event wound down,
 Marshall-Fields and Vann noticed an altercation in a parking
 lot adjacent to the
 
 7
 
 park and went over to investigate. During the ensuing
 confrontation, Ray's friend, Sir Mario Owens, shot and
 killed Vann, and Ray shot Marshall-Fields and Vann's
 brother, Elvin Bell. Ray and Owens then fled in Ray's
 Suburban.
 
 
          ¶6
 Ray and Owens sought to conceal their involvement in these
 shootings. With the help of Ray's wife, LaToya Sailor Ray
 ("Sailor"), and others, Ray and Owens disposed of
 certain evidence that might have connected them to the
 shootings (e.g., the Suburban, guns, and clothes). Owens also
 cut off his braids to change his appearance after he learned
 that a witness had described Vann's shooter as having
 braids. The two men spent the next several days in hiding.
 
 
          ¶7
 Meanwhile, the police attempted to identify the Lowry Park
 shooters. With the help of several witnesses, the police soon
 identified Ray as the driver of the Suburban and arrested him
 as an accessory to the Lowry Park shooting. While awaiting
 his trial on bond, Ray reviewed a discovery packet with Owens
 and Sailor. From this discovery packet, they learned that two
 witnesses-Marshall-Fields and Askari Martin-had identified
 Ray as the getaway driver from the Lowry Park shooting. There
 was nothing in the packet to indicate that the police had
 identified the individual who shot Vann. Ray, Owens, and
 Sailor then began referring to Marshall-Fields and Martin as
 "snitches" and made comments to the effect that
 "snitches do not live long" and "snitches
 die."
 
 8
 
          ¶8
 Around this same time, Ray told his friend Jamar Johnson to
 offer $10,000 to both Marshall-Fields and Martin in exchange
 for them not testifying. Ray also told Johnson that if the
 bribes didn't work, he'd pay Johnson $10,000 to kill
 them both. A few months later, Ray again offered Johnson
 $10,000 to bribe or kill just Marshall-Fields because by
 then, Martin had approached Ray and told him he didn't
 want to "snitch" and that, although the prosecution
 was trying to force him, he wasn't going to testify. Ray
 also told Sailor he wasn't worried about Martin
 testifying anymore. Ray continued to worry, however, about
 Marshall-Fields's testimony, which would make him a
 shooter and place him behind the wheel of the Suburban at the
 Lowry Park shooting.
 
 
          ¶9
 On June 19, 2005-eight days before Ray's Lowry Park
 trial-Sailor went to a Father's Day barbecue at a park.
 Ray called and asked if she'd seen MarshallFields at the
 park. She said she had, and Ray and Johnson arrived soon
 after. They saw Marshall-Fields and watched him leave the
 park. Ray told Johnson that Marshall-Fields was still
 planning to testify and that he would "take things into
 [his] own hands."
 
 
          ¶10
 Later that same day, Ray and Owens were out with their
 friends, Parish Carter and Checados Todd, when they saw
 Marshall-Fields's car at Gibby's, a local sports bar.
 Carter went into the bar and told Marshall-Fields,
 "They're looking for
 
 9
 
 you in the street, homie." The next day, June 20, 2005,
 Marshall-Fields and Wolfe were killed in a drive-by shooting
 on Dayton Street in Aurora.
 
 
          ¶11
 Despite the Dayton Street double murder, Ray's Lowry Park
 trial proceeded as scheduled. In November 2006, the jury
 acquitted Ray of Vann's murder and the attempted murder
 of Jeremy Green (another bystander at the Lowry Park
 shooting), but it convicted him of attempted first degree
 murder and first degree assault of Bell and Marshall-Fields,
 and as an accessory to Vann's first degree murder. The
 court sentenced Ray to 108 years imprisonment for his Lowry
 Park crimes.
 
 
          ¶12
 After the Dayton Street shooting, witnesses finally
 identified Owens as the person who had shot and killed Vann
 at Lowry Park. As a result, Owens was charged and ultimately
 convicted of numerous offenses related to the Lowry Park
 shooting, including Vann's murder.
 
 
          B.
 The Dayton Street Shooting
 
 
          ¶13
 Meanwhile, the investigation of the Dayton Street shooting
 was underway. Police officers had identified Owens as the
 Dayton Street shooter. Ray, however, had an alibi for that
 shooting: He stopped by a barbecue Sailor was hosting at her
 house and then went with her neighbor to a liquor store.
 Still, a grand jury indicted both Ray and Owens for the
 Dayton Street shooting. The men were tried separately.
 
 10
 
          ¶14
 At Ray's trial, the prosecution's theory of the case
 was that, after Ray's attempts to intimidate and bribe
 Marshall-Fields to prevent him from testifying in the Lowry
 Park trial failed, Ray conspired with Owens and Carter to
 kill MarshallFields. The prosecution argued that Ray wanted
 to avoid going to prison for the Lowry Park shooting because
 he was running a lucrative illegal drug business that he
 didn't want to lose.
 
 
          ¶15
 After lengthy trial proceedings related to the Dayton Street
 shooting, a jury convicted Ray of all charges except for
 three witness intimidation counts. The jury then found that a
 capital sentence was appropriate for Ray's role in
 MarshallFields's murder. The district court sentenced Ray
 to consecutive sentences of (1) death for murdering
 Marshall-Fields, (2) LWOP for murdering Wolfe, and (3) an
 aggregate 155 years in prison on the remaining counts.
 
 
          II.
 Analysis
 
 
          ¶16
 Ray now appeals his Dayton Street convictions and the
 resulting LWOP sentence to this court. He contends that the
 trial court made numerous evidentiary errors, including
 admitting a large amount of uncharged misconduct evidence
 under the now-defunct res gestae doctrine. He also challenges
 the court's admission of, among other things, witness-
 and victim-fear evidence, victimimpact evidence, and positive
 evidence of Marshall-Fields's and Wolfe's character.
 Ray further alleges that the prosecution improperly appealed
 to the jurors'
 
 11
 
 sympathies and biases, improperly referenced the grand jury
 indictment, and undermined the presumption of innocence. He
 argues that these errors, either in isolation or
 cumulatively, warrant reversal. Although we agree with Ray
 that the trial court made several evidentiary errors, we
 ultimately conclude that they don't warrant reversal.
 
 
          ¶17
 We also reject Ray's contention that the district court
 erred by refusing to allow Ray to subpoena jurors to testify
 about alleged juror misconduct during deliberations. Finally,
 we reject Ray's claim that his LWOP sentence is
 unconstitutional.
 
 
          ¶18
 We address each of Ray's contentions in turn, discussing
 additional procedural or background facts as needed.
 
 
          A.
 Evidentiary Issues
 
 
          ¶19
 We start by briefly identifying the applicable standards of
 review and general relevancy principles. Trial courts have
 broad discretion to determine the admissibility of evidence,
 and we review those rulings for an abuse of discretion.
 Davis v. People, 2013 CO 57, ¶ 13, 310 P.3d 58,
 61-62. A court abuses its discretion if its decision is
 manifestly arbitrary, unreasonable, or unfair, or if it
 misapplies the law. People v. Montoya, 2024 CO 20,
 ¶ 47, 546 P.3d 605, 616.
 
 
          ¶20
 When an error is preserved by a contemporaneous objection, we
 generally consider whether the error warrants reversal under
 a harmless error standard. Id.
 
 12
 
 An error is harmless if it doesn't substantially
 influence the jury's verdict or affect the fairness of
 the trial proceedings. Id.; see also Crim.
 P. 52(a). To analyze such harm, we may consider "factors
 like evidentiary cross-admissibility, the appropriateness of
 jury instructions, and whether there is any indication that
 the jury blended the issues in considering their
 verdict." Washington v. People, 2024 CO 26,
 ¶ 23, 547 P.3d 1087, 1092. If the error is unpreserved,
 however, we review for plain error. Hagos v. People,
 2012 CO 63, ¶ 14, 288 P.3d 116, 120; see also
 Crim. P. 52(b). Under this standard, we will reverse only if
 the error is obvious, substantial, and so undermined the
 trial's fundamental fairness as to cast serious doubt on
 the reliability of the conviction. Hagos, ¶ 14,
 288 P.3d at 120.
 
 
          ¶21
 Generally, all relevant evidence is admissible. CRE 402.
 "'Relevant evidence' means evidence having any
 tendency to make the existence of any fact that is of
 consequence to the determination of the action more probable
 or less probable than it would be without the evidence."
 CRE 401. However, even relevant evidence may be excluded if
 the risk of unfair prejudice substantially outweighs its
 probative value. CRE 403.
 
 
          ¶22
 With these standards and rules in mind, we unpack the law
 governing the admission of uncharged misconduct evidence and
 apply it to Ray's contentions of error.
 
 13
 
          1.
 Uncharged Misconduct Evidence
 
 
          ¶23
 On appeal, Ray asserts that the trial court erred by
 admitting "significant" evidence of uncharged
 misconduct. He specifically challenges the court's
 admission of evidence related to (1) the Lowry Park shooting;
 (2) threats Ray allegedly made against Brandi Taylor (his
 brother's girlfriend) and Askari Martin (one of the Lowry
 Park witnesses who had identified Ray as the getaway driver);
 (3) an altercation with Sailor in which she suffered a black
 eye; (4) threats Ray allegedly made against Lowry Park
 witness Teresa Riley's son; and (5) Ray's alleged
 drug dealing before 2005. (The drug offenses charged in the
 current case allegedly occurred between January and June
 2005.)
 
 
          ¶24
 The trial court found that the Lowry Park evidence was
 admissible as res gestae but ruled that any such evidence
 admitted at trial must be accompanied by a limiting
 instruction.[2] The court also found that evidence of the
 threats against Martin and Taylor[3] and the incident involving
 Sailor's black eye was admissible as res gestae.
 
 14
 
          ¶25
 The trial court admitted evidence related to the threats
 against Riley's son as impeachment evidence. And lastly,
 the court admitted evidence related to Ray's alleged drug
 dealing before 2005 under CRE 404(b).
 
 
          a.
 Res Gestae Evidence
 
 
          ¶26
 To understand the common law res gestae doctrine, it helps to
 first examine the modern rule governing the admissibility of
 uncharged misconduct evidence: CRE 404(b). Rule 404(b)(1)
 provides that evidence of other crimes, wrongs, or acts
 isn't "admissible to prove a person's character
 in order to show that on a particular occasion the person
 acted in conformity with the character." But this
 evidence may be admissible if offered for another purpose,
 "such as proving motive, opportunity, intent,
 preparation, plan, knowledge, identity, absence of mistake,
 or lack of accident." CRE 404(b)(2). The prosecution
 must provide pretrial written notice of its intent to
 introduce such evidence, specifying "the permitted
 purpose for which the prosecution intends to offer the
 evidence and the reasons supporting that purpose."
 People v. Owens, 2024 CO 10, ¶ 111, 544 P.3d
 1202, 1227; see also CRE 404(b)(3). The court then
 determines whether the evidence is admissible by applying the
 four-prong test outlined in People v. Spoto, 795
 P.2d 1314, 1318-19 (Colo. 1990).
 
 15
 
 If the court determines the uncharged misconduct evidence is
 admissible, and if requested by the defendant, the court must
 "contemporaneously instruct the jurors of the limited
 purpose for which the evidence may be considered."
 Rojas v. People, 2022 CO 8, ¶ 27, 504 P.3d 296,
 305; see also CRE 105.
 
 
          ¶27
 At the time of Ray's trial, Colorado also embraced the
 longstanding res gestae doctrine as an alternate theory of
 admissibility for uncharged misconduct evidence. Under this
 doctrine, such evidence was admissible without adhering to
 Rule 404(b)'s strictures if the evidence was
 "incidental to a main fact and explanatory of it,
 including acts and words which are so closely connected
 therewith as to constitute a part of it, and without a
 knowledge of which the main fact might not be properly
 understood." Rojas, ¶ 18, 504 P.3d at 302
 (quoting Denver City Tramway Co. v. Brumley, 116 P.
 1051, 1052 (Colo. 1911)).
 
 
          ¶28
 While Ray's appeal was pending, we abolished the res
 gestae doctrine. Id. at ¶¶ 1-4, 504 P.3d
 at 300-01. In Rojas, we concluded that this
 amorphous and unpredictable doctrine had become "a
 breeding ground for confusion, inconsistency, and
 unfairness." ¶ 3, 504 P.3d at 301. The Colorado
 Rules of Evidence, we reasoned, suffice to evaluate the
 admissibility of uncharged misconduct evidence. Id.
 at ¶¶ 39-41, 504 P.3d at 307. While we can't
 fault the trial court for failing to foresee this
 development, "we generally apply the law in
 
 16
 
 effect at the time of appeal," and so we must conclude
 that the trial court abused its discretion by admitting any
 evidence under this now-abolished doctrine. Owens,
 ¶ 112, 544 P.3d at 1228.
 
 
          ¶29
 But just because the uncharged misconduct evidence wasn't
 admissible as res gestae doesn't mean it wasn't
 admissible at all. And even if some of this evidence was
 inadmissible, the court's error in admitting it may have
 been harmless. We must consider both possibilities in
 deciding whether the trial court's admission of res
 gestae evidence justifies reversal. See People v.
 Eppens, 979 P.2d 14, 22 (Colo. 1999) (explaining that an
 appellate court may affirm "on any ground supported by
 the record, regardless of whether that ground was relied upon
 or even contemplated by the trial court").
 
 
          ¶30
 So, we begin by considering whether Rule 404(b) could have
 provided an alternative basis for admission. In
 Rojas, we explained that, when "evaluating
 whether uncharged misconduct evidence triggers Rule 404(b), a
 trial court must first determine if the evidence is intrinsic
 or extrinsic to the charged offense." ¶ 52, 504
 P.3d at 309. Intrinsic acts are limited to "(1) those
 that directly prove the charged offense and (2) those that
 occur contemporaneously with the charged offense and
 facilitate the commission of it." Id. at ¶
 44, 504 P.3d at 308. All other acts are extrinsic.
 
 17
 
          ¶31
 Evidence of intrinsic acts is exempt from Rule 404(b)-because
 it is essentially evidence of charged misconduct-and
 courts should consider its admissibility under the general
 rules of relevance and prejudice. Id. at ¶ 52,
 504 P.3d at 309; see also CRE 401-403. The same goes
 for evidence of extrinsic acts that don't suggest the
 defendant's bad character. Rojas, ¶ 52, 504
 P.3d at 309. If, however, the extrinsic-acts evidence
 suggests that the defendant has a bad character and that he
 acted in conformity with that bad character in this instance,
 it is admissible "only as provided by Rule 404(b) and
 after a Spoto analysis." Id.
 
 
          ¶32
 Under Spoto, courts must consider whether the
 evidence (1) relates to a material fact and (2) is logically
 relevant (3) independent of the prohibited inference that the
 defendant has a bad character and acted in conformity with
 that character in this instance, and (4) whether the risk of
 unfair prejudice substantially outweighs the evidence's
 probative value. 795 P.2d at 1318-19; see also
 Owens, ¶ 110, 544 P.3d at 1227.
 
 
          ¶33
 A material fact is one "that is of consequence to the
 determination of the action." Fletcher v.
 People, 179 P.3d 969, 974 (Colo. 2007) (quoting CRE
 401). Material facts include both (1) "ultimate
 facts," such as the elements of the offense, and (2)
 "intermediate facts," meaning facts that are
 probative of ultimate facts. Yusem v. People, 210
 P.3d 458, 464 (Colo. 2009); accord People v. Rath,
 44 P.3d 1033, 1040 (Colo. 2002). In considering whether
 uncharged misconduct evidence is
 
 18
 
 relevant to a material fact, we consider "not the
 substance of the prior act evidence, but the fact in the case
 for which the evidence is offered to prove."
 Yusem, 210 P.3d at 464.
 
 
          ¶34
 Once the court has identified a material fact, it must
 determine if the uncharged misconduct evidence is logically
 relevant to that fact. In other words, does the uncharged
 misconduct evidence have some tendency to make the existence
 of that material fact more or less probable than it would be
 without the evidence? See Owens, ¶ 110, 544
 P.3d at 1227. If the answer is yes, the court continues to
 Spoto's third prong.
 
 
          ¶35
 "The third prong of the Spoto test does not
 demand the absence of the [prohibited] inference but merely
 requires that the proffered evidence be logically relevant
 independent of that inference." People v.
 Snyder, 874 P.2d 1076, 1080 (Colo. 1994) (emphasis
 added); see also Rath, 44 P.3d at 1038 ("[T]he
 evidence must be probative for some logical reason other than
 'that the defendant committed the crime charged because
 of the likelihood that he acted in conformity with his bad
 character.'" (quoting Spoto, 795 P.2d at
 1318)). In other words, "the evidence cannot be relevant
 only to show a propensity to commit crimes."
 People v. Cross, 2023 COA 24, ¶ 21, 531 P.3d
 444, 449 (quoting People v. Denhartog, 2019 COA 23,
 ¶ 42, 452 P.3d 148, 157).
 
 19
 
          ¶36
 In considering Spoto's fourth prong,
 "[u]nfair prejudice occurs . . . if otherwise admissible
 evidence has 'an undue tendency to suggest a decision
 [made] on an improper basis,' which is 'commonly but
 not necessarily an emotional one, such as sympathy, hatred,
 contempt, retribution, or horror.'" People v.
 Cousins, 181 P.3d 365, 370 (Colo.App. 2007) (second
 alteration in original) (quoting People v. Dist.
 Ct., 785 P.2d 141, 147 (Colo. 1990)). On appeal, we
 "must afford the evidence the maximum probative value
 attributable by a reasonable fact finder and the minimum
 unfair prejudice to be reasonably expected."
 Nicholls v. People, 2017 CO 71, ¶ 56, 396 P.3d
 675, 687.
 
 
          ¶37
 We now apply these principles to the trial court's
 rulings.
 
 
          i.
 Lowry Park Evidence
 
 
          ¶38
 Ray preserved his objection to the admission of the Lowry
 Park evidence through pretrial motions and hearings. Thus, we
 review the trial court's erroneous admission of this
 evidence as res gestae for harmless error. In doing so, we
 consider whether the Lowry Park evidence would have been
 admissible under Rule 404(b). Thus, we begin with
 Rojas's threshold intrinsic-extrinsic inquiry
 and then turn to Spoto's four-part test as
 necessary to evaluate extrinsic evidence.
 
 
          ¶39
 As we observed in Owens, "[t]he Lowry Park
 shootings did not directly prove, nor did they occur
 contemporaneously with, the Dayton Street shooting[],"
 so the Lowry Park evidence was extrinsic to the Dayton Street
 charges. ¶ 115, 544 P.3d at 1228;
 
 20
 
 see also Rojas, ¶ 52, 504 P.3d at 309. And
 because the Lowry Park evidence could impermissibly suggest
 that Ray had a bad character and acted in conformity with
 that character in this instance (i.e., he shot someone
 before, so he likely orchestrated the Dayton Street
 shooting), Rule 404(b) and Spoto applied. See
 Rojas, ¶ 52, 504 P.3d at 309.
 
 
          ¶40
 So, we must consider whether the Lowry Park evidence related
 to a material fact in the Dayton Street case. The prosecution
 argued that this evidence was relevant "to establish the
 identities and roles of Ray and Owens in the [Dayton Street]
 shooting as well as their guilty knowledge and [to] form the
 basis of their motive to kill Marshall-Fields," and it
 was therefore admissible to show that "[w]hat would
 otherwise seem like a completely random drive-by shooting
 actually has a context where Mr. Owens has a relationship
 with Mr. Javad Marshall-Fields because of the July 4
 murder of Gregory Vann." (Emphasis added.) ¶41
 "'[M]otive is always relevant' to establish
 whether the defendant committed the charged act and why, and
 may also explain otherwise unexplainable behavior."
 People v. Delsordo, 2014 COA 174, ¶ 14, 411
 P.3d 864, 867 (quoting Wagman v. Knorr, 195 P. 1034,
 1035 (Colo. 1921)). And Rule 404(b) expressly provides that
 uncharged misconduct evidence may be admissible to prove
 motive. Thus, because the Lowry Park evidence was relevant to
 show motive for the Dayton Street shooting, it was logically
 relevant to a material fact. See id. at ¶ 17,
 411 P.3d at 868
 
 21
 
 (recognizing that uncharged misconduct evidence may be
 relevant if it tends to show that the defendant committed a
 second crime to avoid capture for the initial crime).
 
 
          ¶42
 This logical relevance was also independent of any prohibited
 propensity inference. The prohibited inference was that,
 because Ray had been involved in at least attempting to kill
 people before, he was probably involved this time too. But
 the Lowry Park evidence's relevance was independent of
 that inference because it showed how the Lowry Park and
 Dayton Street shootings were connected and explained how the
 first incident provided the motive for the second. See
 Rath, 44 P.3d at 1040 (explaining that motive, while not
 itself an ultimate fact, is among the "well-accepted
 methods of proving the ultimate facts necessary to establish
 the commission of a crime, without reliance upon an
 impermissible inference from bad character").
 
 
          ¶43
 Lastly, we must balance the probative value of the Lowry Park
 evidence against any unfair prejudice it could have
 introduced. This is the trickiest step on these facts.
 There's no doubt that the Lowry Park evidence was highly
 probative. It established a motive for the Dayton Street
 shooting and connected Ray to Dayton Street when there would
 otherwise have been no logical connection. But it also
 carried a substantial risk that the jurors would confuse the
 issues and unfairly assess Ray's guilt based on the
 forbidden propensity inference (i.e., he's a
 
 22
 
 violent man who commits violent crimes) or by conflating the
 strength of the direct evidence from the Lowry Park shooting
 with the more circumstantial evidence from the Dayton Street
 shooting.
 
 
          ¶44
 This final step of the Spoto analysis as to the
 Lowry Park evidence is further complicated by the sheer
 volume of evidence the trial court admitted. That evidence
 included about two weeks of testimony by dozens of witnesses,
 disturbing photographs and videos, and numerous 911 calls.
 The deluge of Lowry Park evidence heightened the potential
 for the jury to simply infer that Ray was a violent person
 with the propensity to commit violent crimes, rather than
 focus on the evidence intrinsic to the Dayton Street
 shooting. The evidence from the Lowry Park shooting that was
 necessary to establish Ray's motive for the Dayton Street
 shooting could have been introduced in perhaps two days,
 rather than through a multitude of witnesses over two weeks
 (of a four-week trial).
 
 
          ¶45
 Nonetheless, even though we might have made a different
 decision than the trial court about how much evidence from
 the Lowry Park shooting to admit under Rule 404(b), we
 conclude that any evidence improperly admitted didn't
 substantially influence the jury's verdict or render the
 trial unfair. See Owens, ¶ 117, 544 P.3d at
 1228-29; see also Zapata v. People, 2018 CO 82,
 ¶ 67, 428 P.3d 517, 531.
 
 23
 
          ¶46
 We reach this conclusion for several reasons. First,
 Ray received ample notice and an opportunity to be heard on
 this issue. Before trial, the parties extensively debated the
 admissibility of the Lowry Park evidence, and at trial, Ray
 was able to cross-examine all the relevant witnesses and to
 record objections in front of the jury.
 
 
          ¶47
 Second, the court read a limiting instruction to the
 jurors each time Lowry Park evidence was discussed or
 admitted, informing them that the evidence was "offered
 for the purpose of establishing background, motive,
 relationship between individuals and identification of the
 Defendant" and reminding them that they could
 "consider it only for those purposes" because Ray
 was "entitled to be tried for the crimes charged in this
 case"-which didn't include any charges related to
 the Lowry Park shooting-"and no other." We assume
 the jury understood and followed this instruction. People
 v. Kembel, 2023 CO 5, ¶ 50, 524 P.3d 18, 28. So,
 even though the evidence wasn't admitted under Rule
 404(b), the trial court essentially provided most of the
 procedural protections required by that rule.
 
 
          ¶48
 Finally, to the extent that some of the Lowry Park
 evidence that the court admitted as res gestae wouldn't
 have been admissible under Rule 404(b), it was mostly
 cumulative. The court could have properly admitted evidence
 establishing what happened at Lowry Park. That
 evidence-whether outlined over two days or proved at a much
 more granular level over two weeks-was always going to
 
 24
 
 be disturbing and potentially inflammatory. With that in
 mind, we conclude that any incremental unfair
 prejudice that might have resulted from the cumulative
 evidence of the Lowry Park shooting was not enough to
 substantially influence the verdict or render the Dayton
 Street trial unfair overall. In short, the trial court's
 erroneous decision to admit evidence of the Lowry Park
 shooting as res gestae was harmless, despite our misgivings
 about the quantity of evidence it chose to admit.
 
 
          ii.
 Threats to Brandi Taylor
 
 
          ¶49
 In opening statements, the prosecutor explained that the
 investigation into the Lowry Park shooting had run into a
 "wall of silence"-for more than a year, no one was
 willing to talk to the investigators. Things changed when
 Brandi Taylor (Ray's brother's girlfriend) disclosed
 what she knew.
 
 
          ¶50
 The prosecutor explained that the detective investigating the
 Dayton Street shooting had obtained a recorded phone call
 between Ray and his brother, Dumas Brown, in which Ray said
 that Taylor had been talking too much on the street and was
 calling Ray a murderer. Ray also told Brown that he had
 threatened to kill Taylor. The prosecutor played portions of
 this recorded phone call for the jury. He then told the
 jurors that it was only after the detective played this call
 for Taylor that Taylor gave the investigators crucial
 information about the Lowry Park shooting and the individuals
 involved, which ultimately led investigators to the evidence
 needed to charge Ray in this case.
 
 25
 
          ¶51
 The phone call was played twice more at trial: once during
 Taylor's testimony and then again during Sailor's
 (Ray's wife) testimony. Ray objected both times.
 
 
          ¶52
 The threats against Taylor were extrinsic to the charged
 offenses: they had nothing to do with Taylor potentially
 testifying against Ray in his Lowry Park trial or with the
 Dayton Street shooting. But because they could suggest that
 Ray had a bad character-that is, that he was the sort of
 person who threatened others- we consider their admissibility
 under Rule 404(b) and Spoto.
 
 
          ¶53
 Despite the prosecutor's explanation of the call's
 significance during the opening statement, the prosecution
 failed to explicitly make that connection during either
 witness's testimony. Still, the call and the threats it
 contained provided context for why Taylor was suddenly
 willing to speak with the police and how investigators came
 to suspect Ray in Marshall-Fields's and Wolfe's
 murders. And the statements Taylor made after hearing those
 threats, about hiding Ray's Suburban in her garage after
 the Lowry Park shooting, tended to show that Ray had
 consistently tried to evade responsibility for his
 involvement in the Lowry Park shooting. Therefore, this
 evidence was logically relevant to one or more material facts
 (identity and motive) because it made it more likely that Ray
 was involved in the Dayton Street shooting.
 
 26
 
          ¶54
 The evidence also, however, implicated the prohibited
 propensity inference that, because Ray threatened to kill
 Taylor, he likely made similar threats to other potential
 witnesses. And because the prosecution didn't connect the
 threats in the phone call to the subsequent investigation,
 other than during the opening statement, the jurors were left
 to make their own inferences about the evidence. Under these
 circumstances, it is debatable whether the relevance of these
 threats was truly independent of the prohibited propensity
 inference.
 
 
          ¶55
 Moreover, Ray wasn't charged with intimidating or
 threatening Taylor; the threats weren't related to her
 (or anyone else) being a witness; Taylor testified that she
 didn't take Ray's threats seriously; and no limiting
 instruction was given when the call was introduced. So, the
 probative value of this evidence was substantially outweighed
 by the risk that Ray would be unfairly prejudiced by it
 because of the likelihood that the jurors would use the
 prohibited propensity inference to convict him. We conclude,
 therefore, that this evidence wasn't admissible under
 Rule 404(b).
 
 
          ¶56
 But the prosecutor's rebuttal closing argument mitigated
 the potential prejudice. As she summarized various
 witnesses' testimony and the evidence that had been
 presented at trial, she said the following:
 
 
 Brandi Taylor is a bit of a distraction in this case....
 [Y]eah, she's important to the investigation. She's
 not overwhelmingly important to determining the guilt of Mr.
 Ray in this case. She's important to
 
 27
 
 the investigation because for the first time law enforcement
 got a chink in that wall of silence.
 
 
          ¶57
 Although a closing argument isn't evidence, this comment
 provided the missing context and helped to minimize the
 potential prejudice resulting from this evidence. Further,
 the jury rendered a split verdict-it found Ray guilty of
 intimidating Marshall-Fields but acquitted him of
 intimidating Riley and Sailor-which indicates that the jurors
 were able to evaluate witness credibility and thoughtfully
 weigh the evidence and that they weren't unduly persuaded
 by any propensity inference they may have made. See
 Washington, ¶¶ 27, 31, 35-36, 547 P.3d at
 1093-94. Accordingly, the error was harmless.
 
 
          iii.
 Threats to Askari Martin
 
 
          ¶58
 Ray objected in pretrial motions and hearings to the
 admissibility of evidence showing that he had threatened
 Martin (a Lowry Park witness who had identified Ray as the
 getaway driver) and had solicited anyone to kill Martin. He
 also maintained continuing objections to this evidence at
 trial. So, we review the trial court's erroneous
 admission of this evidence as res gestae for harmlessness,
 first addressing whether it was otherwise admissible.
 
 
          ¶59
 Ray was charged with conspiring with Owens and Carter to
 commit murder and with soliciting Owens, Carter, and Jamar
 Johnson to commit murder. The prosecution argued that
 evidence related to threats Ray allegedly made against Martin
 (e.g., calling Martin a snitch and saying things to the
 effect that snitches
 
 28
 
 should die) was relevant to show motive and to show the
 scope, nature, and duration of the conspiracy between Ray and
 his friends to eliminate Lowry Park witnesses. Thus, this
 evidence was intrinsic because it was direct proof of the
 charges in this case, and its admissibility was governed by
 the general rules of relevance and prejudice. Rojas,
 ¶ 44, 504 P.3d at 308.
 
 
          ¶60
 The threats against Martin were relevant because they made it
 more likely that Ray committed the offenses of conspiracy and
 solicitation. See CRE 401. Similarly, given that the
 evidence was direct proof of some of the charges, was
 probative of motive, and wasn't unfairly
 prejudicial, we conclude that the probative value was not
 substantially outweighed by the risk of unfair prejudice.
 See Rath, 44 P.3d at 1043 (explaining that unfair
 prejudice "refers only to 'an undue tendency on the
 part of admissible evidence to suggest a decision made on an
 improper basis' and does not mean prejudice that results
 from the legitimate probative force of the evidence"
 (quoting People v. Gibbens, 905 P.2d 604, 608 (Colo.
 1995))).
 
 
          ¶61
 Therefore, we conclude that the trial court's error in
 admitting this evidence as res gestae was harmless because it
 was otherwise admissible, relevant evidence.
 
 
          iv.
 Sailor's Black Eye
 
 
          ¶62
 Before trial, the prosecution sought to introduce evidence
 that Sailor (Ray's wife) and Ray had gotten into an
 argument a few days before the Dayton Street
 
 29
 
 shooting, which resulted in Sailor having a black eye. The
 prosecution argued the evidence was relevant because it would
 (1) help Sailor determine a timeline for the weekend of the
 Dayton Street shooting (e.g., she attended one of Ray's
 pretrial hearings in the Lowry Park case that Friday, so the
 hearing was before this fight because she wouldn't have
 gone to the courthouse with a black eye) and (2) show
 Ray's state of mind that same weekend, which supported
 the prosecution's theory that Ray wasn't calmly
 awaiting justice for the Lowry Park shooting but was nervous
 and actively plotting to avoid conviction.
 
 
          ¶63
 Defense counsel objected, arguing that if the only relevance
 of Sailor's black eye was "to tie time frames,"
 then the fact of Sailor's black eye could be admitted
 without any evidence about how she got it. Moreover, even
 accepting that Sailor's black eye had some probative
 value as to Ray's state of mind the weekend of the Dayton
 Street shooting, defense counsel argued it wasn't enough
 to overcome the unfair prejudice.
 
 
          ¶64
 The court admitted the black-eye evidence as res gestae of a
 timeline for the weekend of the Dayton Street shooting and to
 explain Sailor and Ray's estrangement that same weekend.
 
 
          ¶65
 Because Ray objected to admission of this evidence, the issue
 is preserved, and we review the court's error in
 admitting this evidence as res gestae for harmlessness. The
 evidence that Sailor got a black eye during an argument with
 
 30
 
 Ray the weekend of the Dayton Street shooting was extrinsic
 to the charges in this case. It also suggested bad character;
 that is, that Ray was a domestic abuser. So, we consider
 admissibility under Rule 404(b) and Spoto.
 
 
          ¶66
 Remember, the prosecution argued that Ray masterminded the
 Dayton Street shooting because he wanted to avoid prison for
 his role in the Lowry Park shooting. So, this evidence had
 some tendency to show that Ray used his estrangement from
 Sailor as a means to establish an alibi-he had receipts and
 likely video surveillance from the store where he bought her
 flowers, several people then saw him at Sailor's party
 trying to make amends, and he spoke to her neighbor for a
 while and accompanied the neighbor to a liquor store. Thus,
 Ray's state of mind the weekend before his Lowry Park
 trial was logically relevant to material facts (intent,
 preparation, plan) concerning the Dayton Street conspiracy.
 And this logical relevance was independent of the prohibited
 bad-character inference.
 
 
          ¶67
 In weighing the evidence's probative value against the
 risk of unfair prejudice, however, we agree with defense
 counsel that the probative value of the black-eye evidence
 was substantially outweighed by the danger of unfair
 prejudice. The prosecution could have established the same
 proof by having Sailor testify that she had a black eye
 without stating how she got it or by having witnesses testify
 that Ray and Sailor were upset with each other that weekend
 
 31
 
 without even mentioning Sailor's black eye. The fact of
 the black eye didn't prove that Ray used the disagreement
 to further the conspiracy; instead, it served only to further
 portray Ray as a generally violent person. See Martin v.
 People, 738 P.2d 789, 794-95 (Colo. 1987).
 
 
          ¶68
 Therefore, we conclude that the trial court erred by
 admitting evidence about Sailor's black eye and how she
 got it, and we now consider whether the error warrants
 reversal.
 
 
          ¶69
 The court instructed the jurors that they were to consider
 the black-eye evidence only "for the purpose of
 establishing a time line [sic] and a context for the status
 of [Ray and Sailor's] relationship between June 17th and
 June 21st, 2005." Sailor then explained that she and Ray
 had gotten into a fight, and during the fight, she fell and
 hit her head on the bed, which gave her a black eye. She
 denied that Ray had hit her.
 
 
          ¶70
 Considering the total length of Sailor's testimony, which
 spanned one full day and two partial days of trial, the
 questioning about her black eye was relatively brief and
 peripheral. In the broader context of the four-week trial,
 this black-eye evidence was even less significant.
 Furthermore, we presume the jurors understood and followed
 the court's limiting instruction. See Kembel,
 ¶ 50, 524 P.3d at 28. Consequently, the trial
 court's error in admitting this evidence was
 
 32
 
 harmless. See People v. Herdman, 2012 COA 89,
 ¶¶ 61-62, 310 P.3d 170, 182; see also
 Martin, 738 P.2d at 795.
 
 
          b.
 Teresa Riley's Inconsistent Statements About Threats to
 Her Son
 
 
          ¶71
 Having addressed Ray's challenges to the trial
 court's admission of uncharged misconduct evidence as res
 gestae, we now consider Ray's challenges to other
 uncharged misconduct evidence that the court admitted for
 other purposes. We begin with threats Ray allegedly made to
 Lowry Park witness Teresa Riley's son, Mercedes.
 
 
          ¶72
 During direct examination, the prosecutor asked Riley whether
 she had told detectives that Ray had threatened Mercedes:
 
 
 Q: My question to you was then you deny telling detectives of
 the Aurora Police Department that Mercedes had been
 threatened in connection with his failure to return La[T]oya
 Ray's car?
 
 
 A: No, no. And what do my kids have to do with this? They not
 here on trial. What do my son have to do with this?
 
 
 Q: Well, you had indicated that your son had been threatened?
 
 
 A: I never-[Ray] never threatened my son. How many times do I
 have to say this. Robert Ray has never threatened me or my
 kids. ....
 
 
 Q: Do you deny telling detectives back in September of 2005
 that your son had been threatened by Robert Ray in connection
 with the failure to return La[T]oya Sailor's car?
 
 33
 
 A: I'm fixing to laugh at this because this is crazy.
 I'm tired of repeating myself. He never threatened my son
 over anything, our car, a cigarette, nothing.
 
 
          ¶73
 A few days later, outside the presence of the jury, the
 prosecution sought to impeach Riley by introducing a portion
 of a recorded interview in which Riley told a detective that
 Ray had threatened Mercedes. Defense counsel objected, noting
 that in the interview, Riley said Ray's sister, Markeeta,
 threatened Mercedes, and because the prosecutor hadn't
 asked Riley about Markeeta, the interview wasn't
 admissible. After further argument, it became clear that
 Riley told the detective that Ray had called Markeeta, told
 Markeeta to call Mercedes, and then told Markeeta what to say
 during the call (which included threatening Mercedes).
 Because Riley testified that Ray had never threatened
 Mercedes and denied that she told the detective that he had,
 the court concluded that the recorded interview could be
 played for the jurors to impeach Riley.
 
 
          ¶74
 The prosecution subsequently asked the detective about her
 interview with Riley and started to play the relevant portion
 of the interview. Defense counsel objected while the
 recording was playing. The prosecution countered that it was
 impeachment evidence, and the court agreed, instructing the
 jury that "what Ms. Riley is telling the detectives her
 son told her cannot be considered as the truth by you,
 that's hearsay. It is being offered for the impeachment
 of whether or not
 
 34
 
 Ms. Riley knew that something had been-well, something about
 her son. I'll leave it there." The clip was then
 played in full.
 
 
          ¶75
 "Impeachment is a technique used to attack the
 truth-telling capacity of a witness [and] may be accomplished
 by . . . contradicting the witness on specific facts in her
 testimony." People v. Trujillo, 49 P.3d 316,
 319-20 (Colo. 2002); see also § 16-10-201,
 C.R.S. (2024). Here, the prosecution played the recording,
 not to prove that Ray had threatened Mercedes but to attack
 Riley's credibility. Riley's credibility was relevant
 because Ray was charged with intimidating her as a witness.
 So, the prosecution was entitled to impeach Riley's
 credibility by showing that her in-court testimony that Ray
 had never threatened her or her family was inconsistent with
 her prior, out-of-court statements to the contrary.
 See § 16-10-201.
 
 
          ¶76
 Accordingly, we conclude that the trial court didn't
 abuse its discretion by admitting the recording.
 
 
          c.
 Drug Dealing
 
 
          ¶77
 Ray was charged in this case with drug dealing between
 January 1, 2005, and June 20, 2005. The prosecution filed
 pretrial notice of its intent to introduce uncharged
 misconduct evidence related to Ray's drug dealing
 before 2005. This evidence included several criminal
 charges and various witnesses' observations of Ray's
 drug business.
 
 35
 
          ¶78
 The trial court held a hearing to determine the admissibility
 of this evidence under Spoto. First, it adopted the
 prosecution's argument that the evidence was relevant to
 show (1) motive-"to establish that that's why
 allegedly Mr. Ray would have a witness killed, so that he
 could stay out and make these large amounts of money";
 (2) Ray's ability to "bribe the witnesses or to pay
 to have someone killed"; and (3) the relationship of the
 three co-defendants.
 
 
          ¶79
 Next, the court explained that this evidence was logically
 relevant because it provided a "logical explanation for
 where these huge sums of money come from," given that
 Ray was "a very young man" who wasn't
 "otherwise employed." The court found that the
 evidence also made the existence of the conspiracy more
 likely because
 
 
 Mr. Ray's involvement in these killings is on a
 complicitor type of situation where he has directed or
 orchestrated the situation and his relationship with the two
 people who allegedly were the actual people who fired the
 guns and killed the people, that there is logical relevance
 from the fact that they are involved in a drug relationship.
 There is logical relevance for the jury, if the jury chooses
 to find that the-that relationship resulted in the killings
 of Ms. Wolf[e] and Mr. Marshall-Fields.
 
 
          ¶80
 The trial court then found that, although the drug-dealing
 evidence suggested that Ray had a bad character, its
 relevance to material facts was independent of that
 prohibited inference. Lastly, the trial court determined that
 this evidence had "substantial probative value"
 that wasn't "substantially outweighed by unfair
 prejudice." Based on these findings, the court concluded
 
 36
 
 that the pre-2005 drug-dealing evidence was admissible, but
 it limited the scope of this evidence to a single 2003 arrest
 where Ray was carrying over $2,500 in his shoe and to
 testimony by Ray's wife, Sailor, and his friend, Checados
 Todd, that Ray "ran a drug operation that involved Mr.
 Carter and Mr. Owens" and had access to large amounts of
 cash.
 
 
          ¶81
 When this evidence was admitted during trial, the court gave
 a limiting instruction that reminded the jurors that Ray
 wasn't charged with any distribution offenses that
 occurred before 2005 and that the evidence was being
 introduced only to establish "motive, intent,
 opportunity and identification." We perceive no abuse of
 discretion in the court's Spoto analysis or in
 its decision to admit evidence of Ray's pre-2005 drug
 dealing.
 
 
          2.
 Tattoo Evidence
 
 
          ¶82
 During cross-examination, defense counsel asked Sailor how
 Ray was feeling as his Lowry Park trial approached:
 "[A]lthough he wasn't happy about it, he was ready
 to go to jail? . . . He was kind of accepting that, I'm
 going to jail on this thing?" Sailor agreed with that
 characterization.
 
 
          ¶83
 On redirect, the prosecutor asked Sailor if she remembered
 defense counsel asking her "about what attitude Mr. Ray
 had expressed about his upcoming trial." When she said
 she did, the prosecution then asked, "Between July 4th
 of 2004 and June 20th of 2005, did Mr. Ray get a new tattoo
 on his back that expresses an
 
 37
 
 attitude about crime?" Defense counsel objected on
 relevancy grounds, and a bench conference followed.
 
 
          ¶84
 During the bench conference, the prosecutor argued the tattoo
 evidence was admissible because defense counsel had asked
 Sailor whether Ray "express[ed] an attitude about his
 upcoming trial. I think this is the expression of an attitude
 not only about his upcoming trial but about crime." The
 evidence at issue was a picture of Ray's back, which
 showed a large tattoo depicting two guns, a stack of cash,
 and the words "Crime Payz 999 Wayz"[4]:
 
 
          (Image
 Omitted)
 
 
          ¶85
 The court ultimately found that defense counsel had opened
 the door to this evidence by asking about whether Ray was
 prepared to go to jail: "[T]he issue is
 
 38
 
 . . . his attitude that he was willing to take his punishment
 and go to trial and go to jail and this shows an attitude of
 someone who is favoring crime." So, the court concluded
 that the tattoo evidence was admissible if Ray got the tattoo
 between the Lowry Park and Dayton Street shootings. The
 prosecutor then showed the photo to the jury, asked Sailor
 questions about it, and pressed Sailor about whether Ray
 really accepted that he was likely to go to prison for the
 Lowry Park shooting. ¶86 "The concept of
 'opening the door' represents an effort by courts to
 prevent one party in a criminal trial from gaining and
 maintaining an unfair advantage by the selective presentation
 of facts that, without being elaborated or placed in context,
 create an incorrect or misleading impression." Golob
 v. People, 180 P.3d 1006, 1012 (Colo. 2008). Once one
 party "opens the door" to otherwise inadmissible
 evidence, the other party "may then inquire into the
 previously barred matter." Id. But the concept
 isn't unlimited and "inadmissible rebuttal evidence
 'is permitted "only to the extent necessary to
 remove any unfair prejudice which might otherwise have ensued
 from the original evidence."'" People v.
 Cohen, 2019 COA 38, ¶ 23, 440 P.3d 1256, 1262
 (quoting United States v. Martinez, 988 F.2d 685,
 702 (7th Cir. 1993)). In other words, this doctrine "can
 be used only to prevent prejudice; it can't be used as an
 excuse to inject prejudice into the case." Id.
 at ¶ 23, 440 P.3d at 1262-63.
 
 39
 
          ¶87
 We conclude that the trial court abused its discretion by
 admitting this evidence. The fact that Ray got a tattoo
 depicting guns, money, and a song lyric doesn't rebut
 Sailor's testimony that Ray was willing to face his
 upcoming trial. Moreover, there is nothing connecting this
 tattoo to Ray's motive or intent regarding the Dayton
 Street shooting. The evidence simply wasn't relevant to
 any material fact. And the risk of unfair prejudice that the
 tattoo evidence introduced into trial substantially
 outweighed any minimal probative value it arguably could have
 provided. Thus, the tattoo evidence was inadmissible.
 
 
          ¶88
 We further conclude, however, that the trial court's
 erroneous admission of the tattoo evidence was harmless. The
 prosecutor displayed the picture of the tattoo very briefly
 and asked only two questions about it before taking it down.
 The prosecution again mentioned the tattoo during rebuttal
 closing argument:
 
 
 Now, there is this very interesting photograph .... If you
 really want to know what motivates a person, take a look at
 what they permanently affix to their body.... This is
 [Ray's] attitude towards his case, his attitude towards
 crime, his attitude towards the system.... Not only is it his
 motivation in his life, it is his motive for this murder.
 
 
          This
 comment, doubling down on the trial court's error, was
 inappropriate, but it was also brief. Considering the
 properly admitted testimony regarding Ray's attitude
 about his upcoming trial and evidence about his illegal drug
 operation, we conclude that the error didn't
 substantially influence the jury's verdict or render the
 trial unfair.
 
 40
 
          3.
 Witness- and Victim-Fear Evidence
 
 
          ¶89
 Ray argues that the trial court erred by admitting (1)
 Marshall-Fields's out-of-court statements expressing his
 fear of Ray and (2) evidence related to other witnesses'
 fear of Ray or involvement in the witness protection program.
 He argues that this evidence wasn't relevant to a
 material issue, was unfairly prejudicial, and served only to
 improperly appeal to the jurors' sympathies. We address
 each category of evidence in turn.
 
 
          a.
 Marshall-Fields's Statements of Fear
 
 
          ¶90
 More than two years before Ray's trial for the Dayton
 Street shooting, the prosecution filed a notice of intent to
 introduce various out-of-court statements made by
 Marshall-Fields between the Lowry Park shooting and his
 death. This motion was supplemented several times, with the
 most relevant supplement filed in June 2008, nearly a year
 before Ray's Dayton Street trial. In this motion, the
 prosecution identified five categories of statements
 Marshall-Fields had made that it sought to introduce. These
 were statements in which Marshall-Fields described (1) the
 Lowry Park shooting; (2) the encounter with Ray and his
 associates at the June 19 Father's Day barbecue; (3) the
 June 19 confrontation at Gibby's Bar; (4) various
 attempts to prevent him from testifying, including incidents
 that occurred on and before June 19; and (5) his fear of
 being killed by Ray and his associates. The prosecution
 argued these statements were admissible either
 
 41
 
 because they weren't hearsay or because they fell under a
 hearsay exception-specifically, the then existing state of
 mind exception, CRE 803(3); the excited utterance exception,
 CRE 803(2); or the residual hearsay rule, CRE 807. The
 prosecution also asserted the statements were relevant to
 prove that Ray intimidated and attempted to bribe
 Marshall-Fields and had conspired to have him killed. Ray
 objected based on hearsay, relevance, and unfair prejudice.
 
 
          ¶91
 At the subsequent motions hearing, the court adopted its
 rationale from a pretrial order issued in Owens's case.
 In that order, the court determined that some of
 Marshall-Fields's statements were admissible to prove the
 witness intimidation and witness bribery charges.
 
 
          ¶92
 The court allowed Marshall-Fields's friends and family to
 testify about statements Marshall-Fields had made to them,
 describing incidents when Ray and his associates had
 threatened or intimidated him and expressing his fear of Ray
 and his associates. Specifically, the court admitted the
 following categories of statements: (1) Marshall-Fields
 telling his friends and his uncle about being threatened at
 Gibby's Bar on June 19, 2005 (the day before his murder)
 while he was still at the bar and soon after leaving; (2)
 Marshall-Fields telling his friends about a dream he had
 recently had in which God told him he was going to die; and
 (3) Marshall-Fields telling his sister, on the day of his
 murder, about the encounters at the Father's Day barbecue
 and at Gibby's the day before.
 
 42
 
          ¶93
 Each time a witness testified about these statements, the
 court instructed the jurors to consider them "only with
 respect to the charge of intimidation of a witness or victim
 in which Javad Marshall-Fields is the named victim," and
 it reminded the jurors that "[s]uch statements cannot be
 considered with respect to any other charge."
 
 
          ¶94
 On appeal, Ray asserts that the trial court erred by
 admitting MarshallFields's out-of-court statements. We
 perceive no basis for reversal.
 
 
          i.
 Hearsay Overview
 
 
          ¶95
 "'Hearsay' is a statement other than one made by
 the declarant while testifying at the trial or hearing,
 offered in evidence to prove the truth of the matter
 asserted." CRE 801(c). Although hearsay is generally
 inadmissible, CRE 802, there are several exceptions-notably
 here, the excited utterance and state of mind exceptions, CRE
 803(2), (3), and the residual hearsay rule, CRE 807.
 
 
          ¶96
 The excited utterance exception allows a court to admit
 hearsay statements if they relate "to a startling event
 or condition made while the declarant was under the stress of
 excitement caused by the event or condition." CRE
 803(2). The state of mind exception allows a court to admit,
 as relevant here, "[a] statement of the declarant's
 then existing state of mind, emotion, sensation, or physical
 condition (such as intent, plan, motive, design, mental
 feeling, pain, and bodily health)." CRE 803(3). Lastly,
 the residual hearsay rule provides that a hearsay statement
 
 43
 
 that isn't covered by the exceptions provided in Rules
 803 and 804 may nonetheless be admissible if it has
 "equivalent circumstantial guarantees of
 trustworthiness," and
 
 
 if the court determines that (A) the statement is offered as
 evidence of a material fact; (B) the statement is more
 probative on the point for which it is offered than any other
 evidence which the proponent can procure through reasonable
 efforts; and (C) the general purposes of these rules and the
 interests of justice will best be served by admission of the
 statement into evidence.
 
 
          CRE
 807. The residual hearsay rule also requires the proponent of
 the statement to provide notice of its intent to introduce
 the statement "sufficiently in advance of the trial or
 hearing to provide the adverse party with a fair opportunity
 to prepare to meet it." Id.; see also
 Vasquez v. People, 173 P.3d 1099, 1106-07 (Colo. 2007).
 
 
          ii.
 Statements About Being Threatened at Gibby's
 
 
          ¶97
 Most of the fear statements that Ray challenges on appeal
 relate to an incident at Gibby's Bar on June 19, 2005,
 the night before Marshall-Fields and Wolfe were murdered.
 Earlier that day, Marshall-Fields had gone to a Father's
 Day barbecue at a park with his friend, Brent Harrison.
 Harrison testified that Marshall-Fields saw Ray and some of
 Ray's friends and family there, which made
 Marshall-Fields nervous. So, Harrison and Marshall-Fields
 left the park and went to Marshall-Fields's apartment
 where they made plans to go out that evening with some
 friends.
 
 44
 
          ¶98
 After dinner, the group went to Gibby's for a drink. They
 weren't there long before Marshall-Fields told them they
 needed to leave. Once outside, MarshallFields said that the
 guys he was going to testify against had come up to him in
 the bar and said they were going to kill him. Marshall-Fields
 also called his uncle and told him about what had just
 happened. The uncle told him to leave the bar and come to his
 house. So, Marshall-Fields and his friends left the bar;
 stopped briefly by their apartment complex; and then drove to
 his uncle's house, dropping Harrison off on the way. Once
 Marshall-Fields got to his uncle's house, he called his
 friend Thomas Goodish and told him about the incident at
 Gibby's.
 
 
          ¶99
 In its pretrial order, the court ruled that these statements
 Marshall-Fields made "about the incident at Gibby's
 Bar on June 19, 2005, are admissible under CRE 803(2), 803(3)
 and 807 with a limiting instruction that the evidence can
 only be considered on Counts 14 and 19 [witness intimidation
 and bribery]." We perceive no abuse of the trial
 court's discretion because the statements were admissible
 under the excited utterance exception to the hearsay rule.
 
 
          ¶100
 The admissibility of an excited utterance rests on the idea
 that the event was "sufficiently startling to render
 normal reflective thought processes of the declarant
 inoperative," Compan v. People, 121 P.3d 876,
 882 (Colo. 2005), overruled on other grounds by
 Nicholls, ¶ 33, 396 P.3d at 682, eliminating
 "the possibility of fabrication, coaching, or
 confabulation," People v. Vanderpauye, 2023 CO
 42, ¶ 41, 530 P.3d 1214, 1225
 
 45
 
 (quoting Idaho v. Wright, 497 U.S. 805, 820 (1990)),
 and lending the statement "sufficient trustworthiness to
 overcome the hearsay rule's proscription,"
 id. So, to be admissible as an excited utterance,
 the proponent of the statement must show that "(1) the
 event was sufficiently startling to render normal reflective
 thought processes of the observer inoperative; (2) the
 statement was a spontaneous reaction to the event; and (3)
 direct or circumstantial evidence exists to allow the jury to
 infer that the declarant had the opportunity to observe the
 startling event." Id. at ¶ 42, 530 P.3d at
 1225 (quoting People v. Pernell, 2014 COA 157,
 ¶ 31, 414 P.3d 1, 7). In determining admissibility,
 courts may consider factors such as "the lapse of time
 between the startling event or condition and the out-ofcourt
 statement; whether the statement was a response to an
 inquiry; whether the statement is accompanied by outward
 signs of excitement or emotional distress; and the
 declarant's choice of words to describe the startling
 event or condition." Compan, 121 P.3d at 882.
 
 
          ¶101
 Here, we know Marshall-Fields had an opportunity to observe
 the startling event because Ray's associate, Parish
 Carter, threatened him directly. But whether these statements
 qualified as an excited utterance hinges on temporal
 proximity.
 
 
          ¶102
 We have previously held that "[w]hile the temporal
 proximity of the statement to the startling event or
 condition is important, the two do not have to be
 contemporaneous if the declarant is still under stress when
 the statement is
 
 46
 
 made." Id. But we have more recently concluded
 that "where the time interval between the event and the
 statement is long enough to permit reflective thought, the
 statement will be excluded in the absence of some proof that
 the declarant did not in fact engage in a reflective thought
 process." Vanderpauye, ¶ 47, 530 P.3d at
 1226 (quoting 2 Kenneth S. Broun et al., McCormick on
 Evidence § 272 (Robert P. Mosteller ed., 8th ed.),
 Westlaw (database updated July 2022)). In
 Vanderpauye, however, we were considering the
 temporal proximity of a defendant's selfserving
 statements, not a victim's spontaneous reaction to a
 startling event. We noted that "[t]he temporal element
 takes on added significance when a defendant's
 out-of-court statement is self-serving," id.,
 and the fact that a statement is self-serving is itself
 "an indication that the statement was the result of
 reflective thought," id. at ¶ 46, 530 P.3d
 at 1226 (quoting 2 Broun et al., supra, § 272).
 
 
          ¶103
 Here, there was nothing self-serving about
 Marshall-Fields's statements. Being told he was going to
 be killed was sufficiently startling to render
 MarshallFields's immediate retelling of the threat to his
 friends and his uncle spontaneous: He told them what happened
 within minutes of being threatened and while he was still
 upset about the incident. See Pena v. People, 173
 P.3d 1107, 1112 (Colo. 2007); see also People v.
 Rogers, 68 P.3d 486, 493 (Colo.App. 2002). Although he
 told Goodish about the incident thirty minutes to an hour
 later, by all accounts he was still visibly upset about it.
 See Compan, 121 P.3d at 882; People v.
 Hagos, 250 P.3d 596, 622-23 (Colo.App. 2009);
 
 47
 
 see also People v. Lagunas, 710 P.2d 1145, 1148
 (Colo.App. 1985) ("Because the duration of stress will
 obviously vary with the intensity of the experience and the
 emotional endowment of the individual, the exception
 necessarily vests the trial court with broad discretion in
 applying the rule.").
 
 
          ¶104
 We therefore conclude that the trial court didn't abuse
 its discretion by admitting the statements under the excited
 utterance exception.[5]
 
 48
 
          iii.
 Statements About Marshall-Fields's Dreams
 
 
          ¶105
 Marshall-Fields's friend, Stephanie Hayashido, testified
 that, while they were at the apartment complex after leaving
 Gibby's, Marshall-Fields told her that "he had a
 dream and he said that it was a sign from God that he was
 going to die because he died in his dream, or that God told
 him he was going to die in his dream." Defense counsel
 objected, but the court determined the statement was
 admissible to show Marshall-Fields's state of mind, which
 was relevant to the intimidation charge.
 
 
          ¶106
 Although fear statements may be admissible if the
 victim's state of mind is at issue, People v.
 Acosta, 2014 COA 82, ¶¶ 84-91, 338 P.3d 472,
 486-87; CRE 803(3), Marshall-Fields's state of mind
 wasn't at issue here. A defendant commits the offense of
 witness intimidation if he intentionally uses threats or
 harassment to intimidate a witness. § 18-8-704(1)(a).
 But the prosecution doesn't need to prove that the
 witness was actually intimidated. So, Marshall-Fields's
 state of mind-that is, whether he was scared or felt
 intimidated-wasn't directly relevant to a material
 fact.[6]
 
 49
 
          ¶107
 Even when a victim's state of mind isn't at issue,
 the victim's statements of fear may nonetheless be
 admissible to prove identity, motive, or intent, or to rebut
 certain defenses, such as accident or self-defense.
 E.g., People v. Madson, 638 P.2d 18, 28-29
 (Colo. 1981). But we've only invoked this reasoning in
 homicide cases and, even then, only rarely because
 "[t]he problem with using evidence of a victim's
 fear of another to prove identity, motive, malice, or intent
 in a homicide case is that the victim's statements would
 be 'used indirectly to infer the defendant's past
 conduct (a threat or an assaultive act) from which his future
 conduct and state of mind are inferred.'"
 Rogers, 68 P.3d at 493 (quoting Madson, 638
 P.2d at 29 n.14).
 
 
          ¶108
 Here, although evidence showing that Marshall-Fields was
 scared and was having dreams about dying shortly before he
 was killed may have had some probative value to prove
 identity and intent (that Ray was attempting to intimidate
 Marshall-Fields to keep him from testifying), the statements
 weren't introduced to prove the murder charges-the court
 admitted them only for the intimidation and bribery charges.
 Moreover, any probative value these statements might have had
 was minimal and was substantially outweighed by the risk of
 unfair prejudice. See CRE 403.
 
 
          ¶109
 We therefore conclude that the trial court abused its
 discretion by admitting the statements Marshall-Fields made
 about his dream. However, considering the
 
 50
 
 properly admitted fear statements and the brevity of
 questioning about the dream statements, we conclude that the
 error was harmless. See Zapata, ¶ 62, 428 P.3d
 at 530.
 
 
          iv.
 Statements Made the Day of Marshall-Fields's
 Murder
 
 
          ¶110
 Ray challenges the trial court's admission of statements
 Marshall-Fields made "to Maisha Pollard [his sister]
 about the incidents at the Park Hill barbecue and at
 Gibby's Bar on June 19, 2005." The court found these
 statements "admissible under CRE 803(2), 803(3) and 807
 with a limiting instruction that the evidence can only be
 considered on Counts 14 and 19 [witness intimidation and
 bribery]." (Footnote omitted.)
 
 
          ¶111
 At trial, Pollard testified that Marshall-Fields called her
 on June 20, 2005 (the day he was killed), and "seemed
 very discombobulated," which she said wasn't common
 for him. She said that "[h]e was very confused,
 agitated, anxious, fearful," and he told her,
 "[T]hese dudes are after me.... [T]he dudes I'm
 testifying against.... I keep seeing them. I keep seeing them
 everywhere I go. They were at the store and then they were at
 the barbe[c]ue and then I saw them again.... [T]he people who
 shot me, . . . the people I'm testifying against."
 
 
          ¶112
 "A victim's statements to the effect that she was,
 at the time, afraid of another fall squarely within the state
 of mind hearsay exception under CRE 803 because they refer
 not to past events or conditions, but to the victim's
 then existing
 
 51
 
 state of mind." Cross, ¶ 32, 531 P.3d at
 451 (quoting Rogers, 68 P.3d at 493). And under
 these circumstances, we perceive no abuse of discretion in
 the trial court's admission of these statements under the
 state of mind exception to the hearsay rule.[7] See CRE
 803(3); People v. Haymaker, 716 P.2d 110, 113 n.3
 (Colo. 1986).
 
 
          b.
 Other Witnesses' Statements of Fear
 
 
          ¶113
 Ray asserts that the trial court improperly admitted evidence
 about various witnesses' fear of Ray, evidence about
 those witnesses' reluctance to testify, evidence that
 some witnesses were under witness protection, and evidence
 that some witnesses might be biased because the prosecution
 had given them preferential deals in other cases. Ray
 preserved these issues with contemporaneous objections at
 trial.
 
 
          ¶114
 "Within broad limits," evidence may be admissible
 if it tends to show bias or prejudice, sheds light on a
 witness's inclinations, or explains that a witness's
 "change in statement or reluctance to testify" was
 because of a fear of retaliation. People v.
 Villalobos, 159 P.3d 624, 630 (Colo.App. 2006);
 accord People v. James, 117 P.3d 91, 94 (Colo.App.
 2004). A witness is also "allowed to explain or rebut
 any adverse inferences resulting from cross-examination in
 order to place matters
 
 52
 
 in context so that the jury can evaluate the existence and
 significance of a witness's alleged bias."
 People v. Lesney, 855 P.2d 1364, 1367 (Colo. 1993).
 
 
          ¶115
 Here, the trial court admitted the challenged evidence to
 explain some witnesses' reluctance to testify or changes
 in some witnesses' testimony, or to rebut the assertion
 that witnesses weren't credible because they were being
 paid for their testimony or were being helped by the
 prosecution in other cases in exchange for favorable
 testimony.
 
 
          ¶116
 Thus, we perceive no abuse of discretion in the trial
 court's admission of this evidence.
 
 
          4.
 Victim-Impact Evidence
 
 
          ¶117
 Ray alleges that the trial court erred by allowing the jurors
 to hear "extensive, gratuitous" victim-impact
 evidence related to the Lowry Park shooting during the guilt
 phase of his trial. Elvin Bell testified at Ray's trial
 for the Dayton Street shooting. Bell's brother, Gregory
 Vann (Marhsall-Fields's co-host at the Lowry Park rap
 battle and barbecue), was shot and killed during the Lowry
 Park shooting. Bell was also shot. Ray challenges the
 court's admission of Bell's testimony about
 Vann's personality, work, and hobbies, and about the
 impact watching Vann die had on him. Ray preserved the issue
 by moving before trial to exclude victim-impact evidence
 during the guilt phase of trial. Ray also challenges the
 prosecution's use of photos that depicted
 Marshall-Fields's injuries from the
 
 53
 
 Lowry Park shooting at various times throughout the trial to
 maximize their emotional impact on the jury. Ray didn't
 object when these photos were introduced.
 
 
          ¶118
 "Victim impact evidence is evidence that relates to
 'the victim's personal characteristics and to the
 physical, emotional, or social impact of a crime on its
 victim and the victim's family.'" People v.
 Martinez, 2020 COA 141, ¶ 29, 486 P.3d 412, 419
 (quoting Schreibvogel v. State, 228 P.3d 874, 883
 (Wyo. 2010)). Victimimpact evidence is often relevant and
 admissible at the sentencing phase of trial, but only as it
 relates to the crimes for which the defendant is currently
 being sentenced. People v. Dunlap, 975 P.2d 723,
 744-45 (Colo. 1999); see also §
 18-1.4-102(1)(a)-(b), C.R.S. (2024); §
 18-1.3-1201(1)(a)-(b), C.R.S. (2024).
 
 
          ¶119
 We haven't addressed whether victim-impact evidence is
 ever admissible during the guilt phase of a trial, though a
 division of the court of appeals has. See Martinez,
 ¶¶ 32-34, 486 P.3d at 419-20. In Martinez,
 the division held that, under the facts of that case,
 victim-impact evidence was irrelevant and thus inadmissible
 during the guilt phase of a trial. Id. The division
 reasoned that "victim impact evidence is admissible only
 if it 'tends to show the context or circumstances of the
 crime itself.'" Id. at ¶ 34, 486 P.3d
 at 420 (quoting State v. Graham, 650 S.E.2d 639, 646
 (N.C. Ct. App. 2007)). In other words, although
 victim-impact evidence may be admissible if it's
 "'relevant to determining whether the defendant
 committed
 
 54
 
 the crime' for which they were charged," People
 v. Mena, 2025 COA 14, ¶ 15, 567 P.3d 161, 164-65
 (quoting Martinez, ¶ 33, 486 P.3d at 420),
 "[b]ecause 'the effect of a crime on a [victim or
 the] victim's family often has no tendency to prove
 whether a particular defendant committed a particular
 criminal act against a particular victim,' such evidence
 is generally irrelevant during the guilt/innocence phase of a
 trial," Martinez, ¶ 33, 486 P.3d at 419
 (alteration in original) (quoting Graham, 650 S.E.2d
 at 645). And even if a court determines such evidence is
 relevant, the court must still weigh the probative value of
 the evidence against the risk of unfair prejudice before
 admitting it. CRE 403.
 
 
          ¶120
 Here, the trial court ruled that victim-impact
 evidence-specifically, "evidence about the grieving,
 sadness, and loss that resulted from that incident" and
 evidence about "how someone felt when they saw their
 brother on the ground shot and murdered"-would be
 inadmissible during the guilt phase of the trial. The court
 clarified that it would, however, allow evidence during the
 guilt phase describing "the victim and the life that was
 taken . . . [witnesses] can talk about the life of the
 person." Regarding the prosecution's use of
 pictures, the court said it would have to make those rulings
 in the context of trial.
 
 
          ¶121
 At trial, Bell briefly described Vann's hobbies and
 interests and then discussed the Lowry Park shooting in
 greater detail. But his testimony didn't discuss the
 effect Vann's death had on him or his family and, for the
 most part,
 
 55
 
 just described his personal experience at Lowry Park.
 Similarly, the pictures depicting Marshall-Fields's
 injuries from the Lowry Park shooting were used to help
 describe those injuries and didn't constitute
 victim-impact evidence. Hence, we perceive no abuse of the
 trial court's discretion in admitting this evidence.
 
 
          5.
 Positive Character Evidence
 
 
          ¶122
 Ray contends that the trial court erred by admitting
 extensive and impermissible positive evidence about
 Marshall-Fields's and Wolfe's character that
 "emotionally hijack[ed] the jury's attention."
 Specifically, he challenges the court's admission of (1)
 testimony from several of Marshall-Fields's friends and
 family, regarding his life, character, values, education,
 work, plans for the future, relationships with Wolfe and with
 his nieces, family vacations, and more; and (2) testimony
 from Wolfe's mother, identifying an in-life photograph of
 Wolfe and talking about Wolfe's background, education,
 plans, and her relationship with Marshall-Fields. Ray
 objected to this evidence at trial.
 
 
          ¶123
 The admissibility of evidence related to a victim's good
 character is limited during the guilt phase of trial. Under
 CRE 404(a)(2), the prosecution may introduce (1) evidence of
 a victim's pertinent character trait to rebut defense
 evidence of the same trait or (2) evidence of the
 victim's peaceful character to rebut evidence that the
 victim was the initial aggressor in a homicide case. See
 People v. Miller, 890 P.2d 84, 96 (Colo. 1995)
 (explaining that "character evidence is
 
 56
 
 'pertinent' to the crime charged [if] there is some
 nexus between the proffered character trait and the crime
 charged").
 
 
          ¶124
 Similarly, although in-life photographs of a homicide victim
 may be "admissible if they depict relevant facts,"
 such photographs shouldn't be admitted if they are
 "unnecessarily inflammatory." People v.
 McClelland, 2015 COA 1, ¶ 45, 350 P.3d 976, 984.
 So, for example, in-life photographs may be admissible to
 show "the appearance of the victim, the location and
 nature of his wounds, or his identity." People v.
 White, 606 P.2d 847, 849 (Colo. 1980). But courts must
 still weigh the probative value of such photographs against
 "the danger that their introduction is merely a means of
 'engendering sympathy for the victim with the intent of
 creating an atmosphere of prejudice against the
 defendant.'" McClelland, ¶¶
 46-47, 350 P.3d at 984 (quoting Commonwealth v.
 Rivers, 644 A.2d 710, 716 (Pa. 1994)); see also
 People v. Loscutoff, 661 P.2d 274, 277 (Colo. 1983)
 (concluding that the trial court didn't abuse its
 discretion by admitting photographs of a murder victim and
 her young son, taken several months before the murder,
 because they were relevant to prove identity and their
 probative value outweighed any prejudicial effect).
 
 
          ¶125
 The trial court's pretrial ruling, allowing witnesses to
 "talk about the life of the person," encompassed
 some evidence about Marshall-Fields's and Wolfe's
 lives. During the trial, however, numerous witnesses
 repeatedly testified about
 
 57
 
 Marshall-Fields's and Wolfe's positive character
 traits, and the prosecution introduced several in-life
 pictures of them, both together and separately. None of this
 more extensive evidence was probative of any material fact or
 made it more likely that Ray committed the offenses charged.
 See People v. Jones, 743 P.2d 44, 46 (Colo.App.
 1987). Moreover, it engendered sympathy that could have
 interfered with the jury's ability to render an impartial
 verdict based on the legally relevant facts. Accordingly, we
 conclude that the trial court abused its discretion by
 admitting evidence related to Marshall-Fields's and
 Wolfe's good character during the guilt phase of the
 trial.
 
 
          ¶126
 But this evidence constituted a relatively small portion of
 the trial, and the jurors were properly instructed on their
 duty to weigh all the evidence and to determine the elements
 of each offense beyond a reasonable doubt. We presume they
 did so. See Washington, ¶¶ 25-27, 547 P.3d
 at 1092-93. Therefore, these errors were harmless.
 
 
          B.
 Prosecutorial Misconduct
 
 
          ¶127
 Ray asserts the prosecution committed misconduct by (1) using
 language that encouraged jurors to rely on racial bias and
 prejudice in reaching their verdict, (2) emphasizing the
 grand jury's decision to indict, (3) diluting the
 presumption of innocence, and (4) improperly appealing to the
 jurors' sympathies. In reviewing allegations of
 prosecutorial misconduct, we engage in a two-step
 
 58
 
 process where "[e]ach step is analytically independent
 of the other." People v. Robinson, 2019 CO 102,
 ¶ 18, 454 P.3d 229, 233.
 
 
          ¶128
 First, we must determine whether misconduct
 occurred; that is, whether the prosecution's conduct was
 improper "in the context of the argument as a whole and
 in light of the evidence before the jury." People v.
 Strock, 252 P.3d 1148, 1153 (Colo.App. 2010); see
 also Robinson, ¶ 18, 454 P.3d at 233.
 "Determining whether a prosecutor's actions
 constitute misconduct 'is generally a matter left to the
 trial court's discretion,'" People v.
 Snider, 2021 COA 19, ¶ 31, 491 P.3d 423, 431
 (quoting Domingo-Gomez v. People, 125 P.3d 1043,
 1049 (Colo. 2005)), so we review the record for an abuse of
 that discretion, see Wend v. People, 235 P.3d 1089,
 1097 (Colo. 2010). ¶129 Prosecutors are generally given
 "wide latitude to make arguments based on facts in
 evidence and reasonable inferences drawn from those
 facts." Strock, 252 P.3d at 1153. And while
 prosecutors "can use every legitimate means to bring
 about a just conviction," they have "a duty to
 avoid using improper methods designed to obtain an unjust
 result." Domingo-Gomez, 125 P.3d at 1048.
 Comments calculated to mislead the jury or that suggest the
 prosecution has access to evidence the jurors don't are
 improper. Id. at 1048-49. So too are comments
 "'calculated to inflame the passions or prejudice of
 the jury'" and "arguments that tend to
 influence jurors to reach a verdict based on preexisting
 biases." Robinson,
 
 59
 
 ¶ 20, 454 P.3d at 233 (quoting Dunlap, 975 P.2d
 at 758); see also Domingo-Gomez, 125 P.3d at
 1048-49.
 
 
          ¶130
 Second, if we determine the prosecution's
 comments were improper, we then consider whether that
 misconduct warrants reversal under the appropriate standard.
 Robinson, ¶ 18, 454 P.3d at 233. "To
 determine whether prosecutorial misconduct requires reversal,
 we must evaluate the severity and frequency of the
 misconduct, any curative measures taken by the trial court to
 alleviate the misconduct, and the likelihood that the
 misconduct constituted a material factor leading to the
 defendant's conviction." Strock, 252 P.3d
 at 1153.
 
 
          ¶131
 If a defendant fails to object to the alleged misconduct at
 trial, we review for plain error. Robinson, ¶
 19, 454 P.3d at 233. To warrant reversal under this standard,
 the prosecutorial misconduct must have been "flagrantly,
 glaringly, or tremendously improper." Id.
 (quoting Domingo-Gomez, 125 P.3d at 1053). After
 all, "counsel's failure to object . . . may
 'demonstrate defense counsel's belief that the live
 argument, despite its appearance in a cold record, was not
 overly damaging.'" Strock, 252 P.3d at 1153
 (quoting People v. Rodriguez, 794 P.2d 965, 972
 (Colo. 1990)). But if the defendant preserves the error with
 a contemporaneous objection, we review for harmlessness.
 Wend, 235 P.3d at 1097.
 
 60
 
          1.
 Racial Bias
 
 
          ¶132
 Ray alleges the prosecution injected racial bias into the
 proceedings by using the N-word[8] twenty-four times and by
 repeatedly quoting Owens's alleged comment to Ray after
 the Dayton Street shooting that "it's
 'tooken' care of."
 
 
          ¶133
 "The Constitution prohibits racially biased
 prosecutorial arguments." McCleskey v. Kemp,
 481 U.S. 279, 309 n.30 (1987); see also Robinson,
 ¶ 21, 454 P.3d at 233 ("Although all appeals to
 improper biases pose challenges to the trial process, the
 Supreme Court has observed that an appeal to racial bias
 should be treated with 'added precaution' because
 'racial bias implicates unique historical,
 constitutional, and institutional concerns.'"
 (quoting Pena-Rodriguez v. Colorado, 580 U.S. 206,
 224-25 (2017))). But "it 'is not enough that the
 prosecutors' remarks were undesirable or even universally
 condemned.'" Darden v. Wainwright, 477 U.S.
 168, 181 (1986) (quoting Darden v. Wainwright, 699
 F.2d 1031, 1036 (11th Cir. 1983)). "The relevant
 question is whether the prosecutors' comments 'so
 infected the trial with unfairness as to make the resulting
 conviction a denial of due process.'" Id.
 (quoting Donnelly v. DeChristoforo, 416 U.S. 637,
 643 (1974)); see also Robinson, ¶ 28, 454 P.3d
 at 234.
 
 61
 
          ¶134
 Here, each time the prosecution used the N-word, they were
 quoting Ray's own words. Similarly, the prosecution's
 use of "tooken" was in reference to Owens's own
 words. Ray didn't contemporaneously object to the
 prosecution's failure to paraphrase or modify this
 language, so we will assume, without deciding, that the
 prosecution engaged in misconduct by failing to paraphrase or
 modify Ray's and Owens's language and pivot to
 whether this misconduct was plain, which, again in this
 context, means glaringly improper.
 
 
          ¶135
 To evaluate whether the prosecution's use of the
 challenged language was glaringly improper, we must consider
 the broader context in which it emerged at trial. Here, the
 prosecution didn't unduly highlight the offensive
 language or imply any prejudicial meaning from it. Cf.
 State v. Monday, 257 P.3d 551, 557 (Wash. 2011)
 (concluding that it was "highly improper" for the
 prosecutor to "subtly, and likely deliberately, call to
 the jury's attention" the race of a witness by using
 specific language and to imply that the witness wasn't
 credible because of her race). In most instances, the
 prosecution simply asked witnesses if they remembered Ray or
 Owens saying the quoted language and then moved on. Several
 of the witnesses also spontaneously used similar language
 during their testimony. Although the prosecution repeated the
 language in closing argument, the reference was brief and not
 overtly gratuitous. And the court instructed the jurors that
 "[n]either sympathy nor prejudice should influence
 [their] decision."
 
 62
 
 We once again presume the jury followed this instruction.
 See Robinson, ¶ 32, 454 P.3d at 235.
 
 
          ¶136
 So, although we strongly condemn any prosecutor's use of
 language that may encourage reliance on racial prejudices, we
 conclude that the comments didn't so undermine the
 fundamental fairness of the trial as to cast serious doubt on
 the reliability of the conviction. See Hagos, ¶
 14, 288 P.3d at 120; see also Robinson, ¶¶
 28-34, 454 P.3d at 234-35; Commonwealth v. Chalue,
 162 N.E.3d 1205, 1239 (Mass. 2021); State v.
 Haithcox, 447 P.3d 452, 460-61 (Mont. 2019).
 
 
          2.
 Grand Jury Reference
 
 
          ¶137
 Ray contends that the prosecutor improperly referenced the
 grand jury indictment in rebuttal closing. We disagree.
 
 
          ¶138
 During closing argument, defense counsel told the jury that
 "it's important for you to realize the motives and
 the concerns of the other side." Counsel then described
 the lack of follow-through and the mistakes investigators had
 made in the Lowry Park investigation. He argued that these
 failures affected the Dayton Street investigation because the
 media, politicians, and heads of both the police department
 and the district attorney's office pressured the Dayton
 Street investigators and prosecutors "to make this
 right." Counsel further argued that these pressures were
 compounded by investigators' and prosecutors'
 heightened emotions and personal involvement with these
 cases, which caused a "massive
 
 63
 
 overreaction, overcharging, [and] overzealousness" in
 response to the Dayton Street shooting.
 
 
          ¶139
 In rebuttal closing, the prosecutor responded:
 
 
 There was a comment that somehow the press and political
 desires put a lot of pressure on this process and apparently
 caused the wrong person to be charged. Well, you didn't
 hear any evidence about that.... [N]othing about press
 putting pressure on anyone, nothing about political
 motivations, nothing about people possibly losing their jobs
 if they couldn't solve this case, et cetera.
 
 
 This is a case where a Grand Jury made a decision. Grand Jury
 took testimony, heard evidence and decided to charge, among
 other people, Mr. Ray.
 
 
          Defense
 counsel objected, and the court reminded the jury "that
 an indictment is not evidence of anything." The
 prosecutor continued: "Indictment is not evidence, but
 it was a Grand Jury that . . . made the decision to have Mr.
 Ray charged with these crimes."
 
 
          ¶140
 Prosecutors are allowed to respond to defense counsel's
 arguments and may argue the facts in evidence, the reasonable
 inferences to be drawn from those facts, and any lack of
 support for the defendant's theory of defense. Hafer
 v. People, 492 P.2d 847, 851 (Colo. 1972); People v.
 Walker, 2022 COA 15, ¶¶ 39-40, 509 P.3d 1061,
 1071; People v. Carter, 2015 COA 24M-2, ¶¶
 71-72, 402 P.3d 480, 494. But it is inappropriate for a
 prosecutor to make remarks that have the "potential to
 convey that the prosecution had additional inculpatory
 evidence unknown to the jury." Domingo-Gomez,
 125 P.3d at 1052. Such "remarks of personal knowledge,
 
 64
 
 combined with the power and prestige inexorably linked with
 the office may encourage a juror to rely on the
 prosecution's allegation that unadmitted evidence
 supports a conviction." Id.
 
 
          ¶141
 Here, the prosecutor's reference to the grand jury's
 indictment didn't suggest she had access to evidence the
 jurors didn't. See id. Rather, when viewed in
 context, it was a direct response to defense counsel's
 argument that Ray was charged only because of outside
 pressures and not because there was solid evidence against
 him. See Denhartog, ¶ 55, 452 P.3d at 158;
 People v. Douglas, 2012 COA 57, ¶ 68, 296 P.3d
 234, 249-50. It also reminded the jurors that defense
 counsel's allegations of improper motives weren't
 evidence. See People v. Sanders, 2022 COA 47, ¶
 54, 515 P.3d 167, 179, aff'd on other grounds,
 2024 CO 33, 549 P.3d 947; Denhartog, ¶ 53, 452
 P.3d at 158.
 
 
          ¶142
 Under these circumstances, we conclude that the
 prosecutor's reference to the grand jury's indictment
 wasn't improper.
 
 
          3.
 Presumption of Innocence
 
 
          ¶143
 Ray contends that the prosecutor diluted the presumption of
 innocence and violated his constitutional rights during
 rebuttal closing argument by saying:
 
 
 Now, it is true that at the beginning of a trial every
 defendant is presumed to be not guilty unless and until the
 prosecution has proven beyond a reasonable doubt that in fact
 he is guilty.
 
 
 The evidence in this case has proven beyond any reasonable
 doubt that the defendant, Mr. Ray, committed these crimes in
 order,
 
 65
 
 once again, to avoid being held accountable. He did not want
 to be held accountable for his involvement in the [Lowry
 Park] shooting. He was not a killer in that case because he
 did not want that motivation, that money to disappear.
 
 
 At this time, the evidence has proven that he is guilty and
 the prosecution would ask that you hold him accountable. You
 hold him accountable for committing these terrible crimes in
 order to avoid being held responsible in the past, and we
 would ask that you find him guilty.
 
 
          ¶144
 Divisions of our court of appeals have regularly disapproved
 of comments that suggest "that the presumption of
 innocence that had existed when the trial began was
 'gone' because of the presentation of evidence."
 People v. Conyac, 2014 COA 8M, ¶ 141, 361 P.3d
 1005, 1029; accord, e.g., People v. Ujaama,
 2012 COA 36, ¶¶ 73-74, 302 P.3d 296, 311;
 People v. McBride, 228 P.3d 216, 224 (Colo.App.
 2009). In McBride, for example, the division
 concluded that the prosecutor erred by telling the jurors
 during closing argument that the defendant "sits here in
 front of you a guilty man. That presumption of innocence that
 we had when we started this case is gone." 228 P.3d at
 223. The prosecutor also "told jurors not to begin their
 deliberations at 'not guilty' because,
 'You're about [ten] miles from not guilty before you
 even start deliberating.'" Id. Such
 comments are improper because "[a] defendant retains the
 presumption of innocence throughout the trial
 process unless and until the jury returns a guilty
 verdict," and so, "as a jury evaluates the
 evidence, it must continue to presume the defendant innocent
 until it concludes that the evidence proves guilt beyond a
 reasonable doubt." Conyac, ¶ 141, 361 P.3d
 at 1029
 
 66
 
 (emphases added); People v. Estes, 2012 COA 41,
 ¶¶ 32-33, 36, 296 P.3d 189, 195 ("[A] comment
 that suggests to a jury that the presumption of innocence may
 be eliminated at any time before the jury arrives at a guilty
 verdict-whether upon the close of evidence, or otherwise-is a
 misstatement of the law.").
 
 
          ¶145
 We conclude that the prosecutor's comments here, while
 perhaps inartful, weren't improper. See McBride,
 228 P.3d at 221. Unlike in McBride, the prosecutor
 here didn't encourage the jury to find that the
 presumption of innocence had been overcome even before
 deliberations commenced. And even if we were to infer that
 the prosecutor insinuated as much, defense counsel didn't
 object, and the error wasn't plain.
 
 
          ¶146
 For an error to be plain, it must be obvious. And for an
 error to be obvious, it "must contravene a clear
 statutory command, a well-settled legal principle, or
 established Colorado case law." People v.
 Crabtree, 2024 CO 40M, ¶ 42, 550 P.3d 656, 667. We
 evaluate obviousness at the time the error is made.
 Id. at ¶ 4, 550 P.3d at 660. Although a
 defendant's right to be presumed innocent throughout the
 trial was well-settled during Ray's trial, the first
 appellate opinion to explicitly disapprove of comments at all
 like those the prosecutor made here wasn't announced
 until after Ray's trial. See McBride, 228 P.3d
 at 224 (announcing the opinion on October 1, 2009, nearly
 five months after closing arguments in Ray's
 
 67
 
 trial). Therefore, any error wasn't plain and doesn't
 warrant reversal. See Conyac, ¶ 143, 361 P.3d
 at 1029; see also Ujaama, ¶¶ 73-74, 302
 P.3d at 311.
 
 
          4.
 Emotional Appeal to Juror Sympathies
 
 
          ¶147
 Defense counsel argued in closing that the prosecution wanted
 the jurors "to substitute common sense and suspicion for
 proof beyond a reasonable doubt." He said that although
 the prosecution had talked "about a lot of things that
 could have happened, that it could be that Robert Ray made
 these orders, it could be that Robert Ray instructed these
 people," there was "[n]o reliable proof of any of
 that.... They're hoping that you substitute this
 suspicion, this emotion of this case for reasonable
 doubt." Defense counsel acknowledged that this was
 "an emotional case. It's a horrible, horrible crime,
 no question about it. These poor people have had to go
 through losing a loved one at such a young age and not
 knowing what happened or why." But he reminded the
 jurors that they had "sworn a duty to not let bias or
 your emotions influence you."
 
 
          ¶148
 In rebuttal closing, the prosecutor responded to defense
 counsel's comments:
 
 
 [Defense counsel] pointed out that the families of Javad
 Marshall-Fields and Vivian Wolfe have suffered. They had to
 suffer the tragedy of burying a child. And he indicated that
 they had to do that without knowing what had happened or why.
 
 
 Well, you all do know what happened and you do know why.
 
 68
 
          ¶149
 Ray contends that this comment improperly appealed to the
 jurors' passions and sympathies. We disagree.
 
 
          ¶150
 A "prosecutor should not make arguments that encourage
 the jury to depart from its duty to decide the case on the
 evidence and the inferences reasonably derived
 therefrom." Dunlap, 975 P.2d at 758-59 (quoting
 Standards for Crim. Just., Prosecution Function &Def.
 Function § 3-5.8, comment. at 109 (Am. Bar Ass'n, 3d
 ed. 1993)). The prosecutor's comments here mirrored
 defense counsel's own words and were a response to
 defense counsel's argument about the lack of evidence;
 they didn't improperly appeal to juror sympathies.
 Cf. People v. Vasquez, 2022 COA 100, ¶ 68, 521
 P.3d 1042, 1055-56 (concluding that it was improper for the
 prosecutor to call the case "'a tragedy' for the
 victim and her family," to characterize the trial as
 "a public reckoning," and to tell the jury it was
 "the conscience of our community").
 
 
          ¶151
 We therefore conclude that these comments weren't
 improper.
 
 
          C.
 Cumulative Error
 
 
          ¶152
 Ray contends that the trial court's numerous evidentiary
 errors and the prosecution's misconduct constitute
 cumulative error that violated his right to a fair trial. We
 disagree.
 
 
          ¶153
 The cumulative error doctrine recognizes that although
 individual errors viewed in isolation may be harmless,
 "numerous formal irregularities . . . may in
 
 69
 
 the aggregate show the absence of a fair trial."
 People v. Vialpando, 2022 CO 28, ¶ 33, 512 P.3d
 106, 114 (quoting Howard-Walker v. People, 2019 CO
 69, ¶ 24, 443 P.3d 1007, 1011). After all, a
 defendant's constitutional right to a fair trial includes
 the right to an impartial jury-a right that "comprehends
 a fair verdict, free from the influence or poison of evidence
 which should never have been admitted, and the admission of
 which arouses passions and prejudices which tend to destroy
 the fairness and impartiality of the jury."
 Howard-Walker, ¶ 23, 443 P.3d at 1011 (quoting
 Oaks v. People, 371 P.2d 443, 447 (Colo. 1962));
 see also U.S. Const. amend. VI; Colo. Const. art.
 II, §§ 16, 23. To warrant reversal for cumulative
 error, there must have been multiple errors that collectively
 prejudiced the substantial rights of the defendant and
 affected the integrity of the fact-finding process, even if
 any single error didn't. Howard-Walker,
 ¶¶ 24-25, 443 P.3d at 1011.
 
 
          ¶154
 Here, we have either determined or assumed without deciding
 that the trial court made several errors, including admitting
 Lowry Park evidence as res gestae, evidence of uncharged
 threats to Brandi Taylor, evidence related to Sailor's
 black eye, a picture of Ray's back tattoo, and irrelevant
 hearsay statements MarshallFields made about a dream; and
 allowing improper comments by the prosecution. But we also
 determined that none of those errors individually warranted
 reversal. And now, considering the effect of those errors in
 the aggregate, we conclude that they didn't substantially
 prejudice Ray or undermine the fairness of his trial.
 
 70
 
          ¶155
 Many of the errors involved evidence that was otherwise
 admissible or was cumulative of admissible evidence. And in
 those few instances where the evidence wasn't admissible
 at all, any prejudice was minimized by the brevity of the
 presentation, a limiting instruction, and/or further context
 and explanation through cross-examination or voir dire.
 See Vialpando, ¶ 46, 512 P.3d at 116. Moreover,
 none of the errors established proof of an element of any of
 the charges, improperly implicated a witness's or
 Ray's credibility, or affected Ray's constitutional
 rights. See, e.g., Howard-Walker,
 ¶¶ 40-48, 443 P.3d at 1014-15. The fact that this
 was a lengthy trial that included many witnesses and
 voluminous evidence also minimized the prejudicial impact
 these handful of errors might have had. See
 Vialpando, ¶ 33, 512 P.3d at 114;
 Howard-Walker, ¶ 40, 443 P.3d at 1014.
 
 
          ¶156
 Therefore, we conclude that Ray is not entitled to reversal
 under the cumulative error doctrine.
 
 
          D.
 Juror Misconduct
 
 
          ¶157
 Following Ray's conviction and sentencing, he moved for a
 new trial. In that motion, he alleged that a juror had failed
 to disclose material information on her juror questionnaire
 that revealed potential bias and prejudice. The information
 related to the juror's brother-in-law's recent death,
 her family's suspicions that his death was a homicide,
 and her belief that potential witnesses in that case
 weren't coming forward out of fear. Ray also alleged that
 the juror
 
 71
 
 shared this information with other jurors, which introduced
 extraneous prejudicial information into the deliberative
 process. He asked the court to hold an evidentiary hearing to
 resolve these allegations and to allow him to subpoena jurors
 to testify at the hearing. The parties discussed the issue at
 a postconviction evidentiary hearing for other matters. The
 court concluded that an evidentiary hearing was required to
 discuss the juror's failure to disclose information on
 her questionnaire because it raised issues of potential bias.
 The court further explained that the issue of whether the
 juror had introduced extraneous information into the jury
 room wouldn't be discussed, but it recognized that the
 hearing could "morph" and that the extraneous
 information issue could become relevant.
 
 
          ¶158
 At the subsequent evidentiary hearing, the juror explained
 that her brotherin-law had died of a drug overdose about six
 months before Ray's trial, and "[t]he family fe[lt]
 like it could have been a homicide," or at least, they
 "would like to think" his death wasn't a drug
 overdose. She also said that she never saw a police report
 and never spoke to the police about her brother-in-law's
 death. She conceded it was possible that there were witnesses
 who weren't coming forward regarding her
 brother-in-law's death, but she didn't have any
 information that such witnesses existed. During
 cross-examination, she further explained that
 
 72
 
 although the family had questioned the circumstances of her
 brother-in-law's death, the police had never indicated it
 was anything other than an overdose.
 
 
          ¶159
 At one point during the juror's direct examination,
 defense counsel asked if she had told the other jurors about
 her brother-in-law's death, and she said,
 "Yes." He then asked her to "tell me what you
 told the members of the jury," and the prosecution
 objected, arguing that the questioning fell under CRE 606 and
 invaded "the province of the jury's deliberative
 process." The court sustained the objection. After
 further discussion, defense counsel asked the juror whether
 her brother-inlaw's "suspicious death . . . cause[d]
 [her] to have any special insight during [the] deliberations
 in [Ray's] case," and she said, "No."
 Counsel then again asked the juror whether she shared this
 information with the other jurors, and the court again
 sustained the prosecutor's objection.
 
 
          ¶160
 At the end of the hearing, the court concluded that the juror
 hadn't deliberately hidden information in answering the
 questionnaire and hadn't, by her conduct, deprived Ray of
 the opportunity to challenge her for cause. The court also
 concluded that Rule 606 precluded it from inquiring into the
 extraneousinformation allegations.
 
 
          ¶161
 Ray contends that the court erred by concluding that Rule 606
 precluded it from inquiring into the extraneous-information
 allegations. We disagree.
 
 73
 
          ¶162
 Colorado law strives "to promote finality of verdicts,
 shield verdicts from impeachment, and protect jurors from
 harassment and coercion" and therefore "strongly
 disfavors any juror testimony impeaching a verdict."
 Peopl v. Harlan, 109 P.3d 616, 624 (Colo. 2005);
 accord Clark v. People, 2024 CO 55, ¶ 66, 553
 P.3d 215, 230. As a result, a juror is prohibited from
 testifying "as to any matter or statement occurring
 during the course of the jury's deliberations or to the
 effect of anything upon . . . any . . . juror's mind or
 emotions as influencing the juror to assent to or dissent
 from the verdict . . . or concerning the juror's mental
 processes in connection therewith," though a juror may
 testify about "whether extraneous prejudicial
 information was improperly brought to the jurors'
 attention." CRE 606(b).
 
 
          ¶163
 The scope of this no-impeachment rule is broad and allows for
 exceptions only when allegations of juror bias are so extreme
 that the usual safeguards aren't sufficient to protect
 the integrity of the jury-trial right. See
 Pena-Rodriguez, 580 U.S. at 221. So, for example,
 relying on the nearly identical federal version of this rule,
 the Supreme Court has allowed inquiry into the deliberative
 process when there was "a showing that one or more
 jurors made statements exhibiting overt racial bias that cast
 serious doubt on the fairness and impartiality of the
 jury's deliberations and resulting verdict."
 Id. at 225. To justify setting aside the
 noimpeachment bar, the statements "must tend to show
 that racial animus was a
 
 74
 
 significant motivating factor in the juror's vote to
 convict." Id. at 225-26. But the Court has
 precluded inquiry into juror deliberations even when it was
 alleged that a juror was inebriated during deliberations and
 when a juror allegedly lied about a pro-defendant bias during
 voir dire. See id. at 219-21 (discussing Tanner
 v. United States, 483 U.S. 107 (1987), and Warger v.
 Shauers, 574 U.S. 40 (2014)).
 
 
          ¶164
 A party seeking to impeach a verdict based on the improper
 introduction of extraneous prejudicial information to the
 jurors "must show both that extraneous information was
 improperly before the jury and that the extraneous
 information posed the reasonable possibility of prejudice to
 the defendant." Clark, ¶ 68, 553 P.3d at
 230 (quoting Kendrick v. Pippin, 252 P.3d 1052, 1063
 (Colo. 2011), abrogated on other grounds by Bedor v.
 Johnson, 2013 CO 4, 292 P.3d 924). So, courts must first
 determine whether the complaining party "has presented
 competent evidence alleging that extraneous prejudicial
 information was improperly before the jury."
 Id. at ¶ 70, 553 P.3d at 230. Because this
 determination presents a mixed question of law and fact, we
 review the court's factual findings for an abuse of
 discretion and its legal conclusions de novo.
 Kendrick, 252 P.3d at 1064. Whether information
 constitutes extraneous prejudicial information is a question
 of law. Clark, ¶ 65, 553 P.3d at 230.
 
 
          ¶165
 If a court determines the challenged information wasn't
 extraneous or prejudicial, it may dismiss a motion for a new
 trial without an evidentiary hearing.
 
 75
 
 Id. at ¶¶ 70, 74, 553 P.3d at 231. But if
 the court determines the information was extraneous and
 prejudicial, it must then determine whether there was an
 objectively "reasonable possibility that the . . .
 information influenced the verdict to the detriment of the
 defendant." Id. at ¶ 71, 553 P.3d at 231.
 This determination is often made after an evidentiary
 hearing. Id.; accord Harlan, 109 P.3d at
 625.
 
 
          ¶166
 Extraneous information is "any information that is not
 properly received into evidence or included in the
 court's instructions." Kendrick, 252 P.3d
 at 1064 (quoting Harlan, 109 P.3d at 624). It
 "'consists of (1) "legal content and specific
 factual information" (2) "learned from outside the
 record" (3) that is "relevant to the issues in a
 case."'" Clark, ¶ 75, 553 P.3d at
 231 (quoting People v. Newman, 2020 COA 108, ¶
 15, 471 P.3d 1243, 1250). Extraneous information is improper
 for jury consideration. Kendrick, 252 P.3d at 1064
 (explaining that jurors are instructed "to consider only
 the evidence admitted at trial and the law as given in the
 trial court's instructions" (quoting
 Harlan, 109 P.3d at 624)).
 
 
          ¶167
 But jurors are expected "to use their life experiences
 to engage the record evidence and to participate in
 thoughtful deliberations." Id. at 1066
 ("[T]his approach recognizes the traditional role of the
 jury, that the jurors are expected to call on their personal
 experiences and common sense in reaching their
 verdict."). So, information isn't considered
 extraneous "if it was 'part of the juror's
 background, gained before the juror was selected to
 participate in the case and not
 
 76
 
 as the result of independent investigation into a matter
 relevant to the case.'" People v. Clark,
 2015 COA 44, ¶ 222, 370 P.3d 197, 227 (quoting
 Kendrick, 252 P.3d at 1066).
 
 
          ¶168
 Here, although the juror's family had suspicions about
 her brother-in-law's death, there was no evidence of foul
 play and no investigation in which the juror was involved or
 of which she was aware. And based on the juror's
 testimony at the hearing, it seems she was only peripherally
 aware of the family's suspicions and not pursuing any
 sort of investigation herself. Cf. id. at
 ¶¶ 239-40, 370 P.3d at 229 (concluding that jurors
 introduced extraneous information into deliberations when
 they conducted an informal experiment to test the credibility
 of witness testimony during the trial). Rather, this
 information was part of the juror's background and
 personal life experience, independent of the trial. It
 wasn't, therefore, extraneous.
 
 
          ¶169
 And even if it was, there's no reasonable possibility
 that this information could have prejudiced Ray because it
 didn't contain any information relevant to the issues in
 Ray's case. Moreover, "[b]ecause the line between
 past experience and extraneous information is a fine one, the
 admonition that we 'err in favor of the lesser of two
 evils - protecting the secrecy of jury deliberations at the
 expense of possibly allowing irresponsible juror
 activity' - is important." Clark, ¶
 84, 553 P.3d at 232 (quoting Garcia v. People, 997
 P.2d 1, 7 (Colo. 2000)). So, we
 
 77
 
 conclude that Rule 606(b) precluded jurors from testifying
 about the alleged juror misconduct.
 
 
          E.
 Cruel and Unusual Punishment
 
 
          ¶170
 Following the guilt phase of Ray's trial, the court held
 a separate penaltyphase trial, which resulted in the
 imposition of a death sentence. The Governor later commuted
 Ray's capital sentence to LWOP. Ray now challenges, for
 the first time, his LWOP sentence as unconstitutional, both
 facially and as applied, under the Eighth Amendment of the
 U.S. Constitution. He asks this court to remand his case so
 the district court can hold an evidentiary hearing to address
 these constitutional challenges.
 
 
          ¶171
 We review constitutional challenges to sentencing
 determinations de novo. Lopez v. People, 113 P.3d
 713, 720 (Colo. 2005). In doing so, we recognize that it is
 the legislature's prerogative to define crimes and
 punishments, circumscribed of course by the Eighth
 Amendment's prohibition against "cruel and unusual
 punishments," and so we generally defer to the
 legislature's policy choices regarding sentencing.
 McDonald v. People, 2024 CO 75, ¶¶ 8, 10,
 560 P.3d 412, 417-18 (quoting U.S. Const. amend. VIII);
 accord Colo. Const. art. II, § 20; Ewing v.
 California, 538 U.S. 11, 25 (2003) (plurality opinion).
 We also generally presume that statutes are constitutional
 unless "the party challenging it proves its
 unconstitutionality beyond a reasonable doubt." Woo
 v. El Paso Cnty. Sheriff's Off.,
 
 78
 
 2022 CO 56, ¶ 21, 528 P.3d 899, 905 (quoting Coffman
 v. Williamson, 2015 CO 35, ¶ 13, 348 P.3d 929,
 934).
 
 
          ¶172
 "A statute is facially unconstitutional only if no
 conceivable set of circumstances exist under which it may be
 applied in a constitutionally permissible manner."
 People v. Montour, 157 P.3d 489, 499 (Colo. 2007). A
 statute is unconstitutional as applied if it doesn't,
 "with sufficient clarity, prohibit the conduct against
 which it is enforced." People v. Shell, 148
 P.3d 162, 173 (Colo. 2006) (quoting People v.
 McIntier, 134 P.3d 467, 475 (Colo.App. 2005)).
 
 
          ¶173
 The Colorado legislature has created a sentencing scheme that
 guides our courts in resentencing defendants who were
 initially sentenced to death under Colorado's previous
 capital sentencing scheme. Under this revised sentencing
 scheme, "the court which previously sentenced a person
 to death shall cause such person to be brought before the
 court, and the court shall sentence such person to life
 imprisonment." § 18-1.3-401(5), C.R.S. (2024). The
 statute further explains that, for defendants like Ray, who
 committed their offenses between July 1, 1990, and July 1,
 2020, life imprisonment means LWOP. §
 18-1.3-401(4)(a)(III); see also People v. Tate, 2015
 CO 42, ¶¶ 32-34, 352 P.3d 959, 967 (describing
 Colorado's evolving definition of "life
 imprisonment").
 
 
          ¶174
 Ray seems to argue as follows. "[T]he Eighth Amendment
 forbids a sentencing scheme that mandates life in prison
 without the possibility of parole
 
 79
 
 for juvenile offenders." Miller v. Alabama, 567
 U.S. 460, 479 (2012); see also Graham v. Florida,
 560 U.S. 48, 74-75 (2010). Ray was nineteen when he committed
 the offenses here. And while nineteen-year-olds aren't
 juveniles, they should be included in that statutory
 definition because "developing brain science" is
 expanding "the longstanding recognition that juveniles
 have diminished moral culpability for their crimes . . . to
 encompass emerging adults-those who were [eighteen to twenty]
 years old at the time of their crimes." Therefore,
 Ray's LWOP sentence is facially unconstitutional. We
 reject Ray's argument for two reasons.
 
 
          ¶175
 First, both the Colorado legislature and the U.S.
 Supreme Court recognize eighteen as the age that divides
 juveniles and adults, and neither has yet adopted a broader
 definition of "juvenile." See Graham, 560
 U.S. at 74-75 (noting that "[t]he age of [eighteen] is
 the point where society draws the line for many purposes
 between childhood and adulthood" (first alteration in
 original) (quoting Roper v. Simmons, 543 U.S. 551,
 574 (2005))); § 19-1-103(10), (21), (88), C.R.S. (2024)
 (defining "Adult" as "a person eighteen years
 of age or older"; "Child" as "a person
 under eighteen years of age"; and "Juvenile"
 as having the same meaning as "Child");
 accord § 19-2.5-102(6), (28), C.R.S. (2024).
 And, within constitutional limits, we are bound by the
 legislature's policy choices.
 
 
          ¶176
 Second, Ray's LWOP sentence wasn't imposed
 by a court; it was granted by the Governor, exercising his
 authority to commute Ray's death sentence. The
 
 80
 
 Governor has exclusive authority "to grant reprieves,
 commutations and pardons after conviction." Colo. Const.
 art. IV, § 7. Thus, so long as the Governor's
 "commutation is constitutionally permissible" and
 the original sentence was "legally imposed by a
 court," the judiciary has no authority to alter the
 sentence. Johnson v. Perko, 692 P.2d 1140, 1142
 (Colo.App. 1984); accord People ex rel. Dunbar v. Dist.
 Ct., 502 P.2d 420, 421 (Colo. 1972); People v.
 Davis, 526 P.2d 312, 313 (Colo. 1974). Ray's LWOP
 sentence meets both criteria.
 
 
          ¶177
 Ray was originally sentenced pursuant to the capital
 sentencing procedures in place at the time of his conviction,
 and he hasn't argued on appeal that his original capital
 sentence wasn't legally imposed. Moreover, under the
 sentencing statutes, a court could have resentenced Ray to
 LWOP following the death penalty's abolishment, and we
 have previously held that mandatory LWOP sentences for adult
 class 1 felony offenders aren't categorically
 unconstitutional. Sellers v. People, 2024 CO 64,
 ¶ 37, 560 P.3d 954, 962.[9]
 
 81
 
          ¶178
 We thus conclude that it is facially constitutional for the
 Governor to commute a defendant's capital sentence to
 LWOP when the defendant was at least nineteen years old when
 he committed the relevant offenses.
 
 
          ¶179
 We also conclude that Ray's sentence is constitutional as
 applied to him because we assume that in commuting Ray's
 sentence, the Governor adhered to the statutory requirements
 and considered Ray's conduct during incarceration and his
 reformation potential. See § 16-17-102(1),
 C.R.S. (2024). And while we commend Ray for refocusing his
 life in a positive direction, we determine constitutionality
 at the time a sentence is imposed. See, e.g.,
 Lucero v. People, 2017 CO 49, ¶¶ 26-29,
 394 P.3d 1128, 1134 (concluding that the defendant's
 sentence was constitutional and "appropriate"
 because the sentencing court considered the relevant
 circumstances at the time the sentence was imposed).
 Therefore, we need not remand this case to the trial court
 for an evidentiary hearing regarding these claims.
 
 
          III.
 Conclusion
 
 
          ¶180
 We affirm the trial court's judgment of conviction and
 Ray's LWOP sentence.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Ray was also charged with two counts
 of second degree murder, naming Marshall-Fields and Wolfe as
 victims; one count of conspiracy to commit murder; three
 counts of solicitation to commit murder; two counts of
 aggravated intimidation of a witness and two counts of
 retaliation against a witness, naming Marshall-Fields and
 Wolfe as victims; three counts of intimidating a witness,
 naming Marshall-Fields, Teresa Riley, and LaToya Sailor Ray
 as victims; one count of unlawful distribution of a
 controlled substance; one count of bribing a witness, naming
 Marshall-Fields as the victim; one count of violating bail
 bond conditions; one count of violating a restraining order;
 and two crime-of-violence sentence enhancers.
 
 
 [2] Many of the pretrial motions,
 hearings, and orders addressed Owens, Ray, and Carter at the
 same time. However, because Owens's trial was scheduled
 to go first, the court often addressed the issues as to Owens
 and then later either adopted or incorporated those rulings
 as to the other defendants.
 
 
 [3] It is the parties' duty to
 identify where in the record the ruling or order they seek to
 have us review is located. C.A.R. 28(a)(7). But the parties
 failed to identify where the trial court provided its reason
 for admitting the evidence containing the threats against
 Taylor, and although we aren't required to scour the
 record for such information, we have looked and haven't
 found a clear ruling. So, we will review the court's
 admission of these threats as if they were admitted under the
 res gestae doctrine. See People v. Notyce, 2014 COA
 52, ¶ 4, 328 P.3d 302, 303.
 
 
 [4] The tattoo references a lyric from the
 song, "Crime Pays" by Cam'ron: "Crime pays
 99 ways, 9 gauge, AK-47 homey hit the highway."
 Cam'ron, Crime Pays, on Crime Pays
 (Diplomat Records 2009).
 
 
 [5] Even if these statements weren't
 excited utterances, they were admissible under the residual
 hearsay rule. First, the statements were relevant to
 a material fact. Ray was charged with intimidating a witness,
 which required the prosecution to prove that Ray used "a
 threat, act of harassment . . ., or act of harm or
 injury" against a witness in a criminal proceeding.
 § 18 8 704(1)(a), C.R.S. (2024). So,
 Marshall-Fields's statements to his friends that he was
 threatened in Gibby's were relevant to show that Ray
 (through Carter) committed that offense. Second, had
 Marshall-Fields not been killed, he could have testified to
 these facts directly since he was the person to whom the
 threats were made. But because Marshall-Fields was
 unavailable to testify, his friends' testimony about what
 he told them was more probative of this fact than any other
 evidence that could reasonably have been obtained. See
 Pena, 173 P.3d at 1112. Third, the general
 purposes of the rules of evidence and the interests of
 justice were served by admission of these statements. See
 id.; see also CRE 803(2)-(3), 804, 807;
 Vasquez, 173 P.3d at 1104 ("The forfeiture
 doctrine prevents defendants from profiting by their own
 misconduct ...."). The parties discussed the
 admissibility of Marshall-Fields's statements under the
 residual hearsay rule at a pretrial hearing nearly nine
 months before trial, providing Ray with ample notice that the
 statements would be offered into evidence at trial and an
 opportunity to object before the evidence was presented to
 the jury. See Pena, 173 P.3d at 1112. And, as
 discussed above, Marshall-Fields made these statements under
 conditions that provided circumstantial guarantees of
 trustworthiness. See id.; Compan, 121 P.3d
 at 882.
 
 
 [6] For this same reason, the statements
 weren't admissible under the residual hearsay exception.
 See CRE 807 (admissibility requires the court to
 find that the statement is relevant to a material
 fact).
 
 
 [7] We also conclude that, for the same
 reasons the statements Marshall-Fields made to his friends
 about the incident at Gibby's were admissible under the
 residual hearsay rule, these statements were admissible under
 the residual hearsay rule as well.
 
 
 [8] The prosecutor used the actual racial
 slur during trial, which we won't repeat here. We use
 "N-word" in this opinion instead to minimize the
 harm such language may cause.
 
 
 [9] Even if nineteen-year-olds were
 juveniles for sentencing purposes, the Supreme Court in
 Miller held only that mandatory LWOP
 sentences for juveniles are unconstitutional. 567 U.S. at
 479-80; see also, e.g., Graham, 560 U.S. at 74-75.
 But there was nothing mandatory about Ray's LWOP
 sentence. The Governor is authorized to commute a capital
 sentence "by reducing the penalty . . . to imprisonment
 for life or for a term of not less than twenty years at hard
 labor." § 16-17-101, C.R.S. (2024). Thus, the
 Governor wasn't required to reduce Ray's sentence to
 LWOP; he had other options. But he chose LWOP after,
 presumably, considering the circumstances of this particular
 case as required by statute-including, Ray's character
 before conviction and during confinement, any
 "statements of the sentencing judge and the district
 attorneys . . . and any other material [or comments]
 concerning the merits of the [commutation] application"
 that the Governor believed to be "just and proper,"
 "with due regard for the reformation of the
 accused." § 16-17-102(1), C.R.S. (2024).
 
 
 ---------